Sebastian CARDONA, Plaintiff,

v.

GENERAL MOTORS CORPORATION,
Defendant.

Louis MARAZZO, Plaintiff,

v.

CHEVROLET MOTOR DIVISION OF
the GENERAL MOTORS COR-
PORATION, Defendant.

Civil Action No. 95–2973, 95–1476.

United States District Court,
D. New Jersey.

Aug. 8, 1996.

James Lewis Griffith, Wolf, Block, Schorr and Solis–Cohen, Camden, N.J., for Appellants, Jay M. London, and Kimmel & Silverman, P.C.

Thomas V. Convery, Tansey, Fanning, Haggerty, Kelly, Convery & Murray, Woodbridge, NJ, for Appellee, General Motors Corporation.

## OPINION

ORLOFSKY, District Judge:

These consolidated appeals are before the court pursuant to Rule 40.D.4 of the General Rules of the United States District Court for the District of New Jersey (hereinafter "General Rule 40.D.4") which governs appeals from non-dispositive orders of a magistrate judge. The orders appealed from, which were filed on December 5, 1995,[1] disqualified Jay M. London, Esq. ("London"), and the law firm of Kimmel & Silverman, P.C., from further representing plaintiffs in these actions pursuant to Rules 1.9 and 1.10 of the Rules of Professional Conduct.[2]

---

1. The Opinion of Magistrate Judge Kugler, filed December 5, 1995, by agreement of counsel, applied to twenty (20) separate actions that General Motors was then defending, all of which had been brought by the firm of Kimmel & Silverman. These are set forth by name in Magistrate Judge Kugler's Opinion at page 2. Magistrate Judge Kugler then issued twenty (20) separate Orders disqualifying Kimmel & Silverman. Since December 5, 1995, all but the two above-captioned cases have settled, or otherwise been voluntarily dismissed.

2. General Rule 6 A. of this court states that:
   The Rules of Professional Conduct of the American Bar Association as revised by the

New Jersey Supreme Court shall govern the conduct of the members of the bar of this Court, subject to such modification as may be required or permitted by federal statute, regulation, court rule or decision of law.

In pertinent part, the Rules of Professional Conduct provide:

**RPC 1.9 Conflict of Interest: Former Client**

(a) A lawyer who has represented a client in a matter shall not thereafter:

(1) represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client consents after a full disclosure of the

These appeals require this court to apply the New Jersey Rules of Professional Conduct to that modern-day vagabond of our legal culture known as the "side-switching attorney." Two distinct issues are presented for this court's resolution: (1) whether Magistrate Judge Kugler erred in disqualifying Jay M. London, Esq., pursuant to R.P.C. 1.9(a)(1), R.P.C. 1.9(a)(2) and R.P.C. 1.9(b); and, (2) if not, whether Magistrate Judge Kugler nevertheless erred in ordering the imputed disqualification of the firm of Kimmel & Silverman, P.C., pursuant to R.P.C. 1.10. Because this court concludes that Magistrate Judge Kugler's disqualification Orders are amply supported by the factual findings and legal precedents set forth in his Opinion filed concurrently with the disqualification Orders,[3] the Orders will be affirmed.

## I. Facts and Procedural History

These actions were brought under the New Jersey "Lemon Law,"[4] the Magnuson–Moss Warranty Act,[5] the Uniform Commercial Code,[6] the New Jersey Consumer Fraud Act,[7] and a common-law claim alleging detrimental reliance. This court's jurisdiction of these cases is based upon diversity of citizenship and an amount in controversy in excess of $50,000, exclusive of interest and costs. *See* 28 U.S.C. § 1332.

The firm of Kimmel & Silverman, P.C. ("K & S"), has developed a practice devoted almost exclusively to the representation of plaintiffs in "lemon law" cases. Magistrate Judge Kugler's Opinion, filed December 5, 1995, ("Opinion") at 4. On June 2, 1995, London, who had previously represented General Motors Corporation ("GM") while employed as an associate at two different Philadelphia law firms,[8] disclosed to GM his intention to accept an associate's position with the firm of K & S. Opinion at 12. London sent a letter to GM which requested its consent. GM did not consent, or otherwise respond to London's letter. *Id.*

---

circumstances and consultation with the former client; or

(2) use information relating to the representation to the disadvantage of the former client except as RPC 1.6 would permit with respect to a client or when the information has become generally known.

(b) The provisions of RPC 1.7(c) are applicable as well to situations covered by this rule.

**RPC 1.10 Imputed Disqualification: General Rule**

(a) When lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by RPC 1.7, RPC 1.8, RPC 1.9 or RPC 2.2.

(b) When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by RPC 1.6 and RPC 1.9(a)(2) that is material to the matter.

\* \* \* \* \* \*

(e) A disqualification prescribed by this rule may be waived by the affected client under the conditions stated in RPC 1.7 except where prohibited by law or regulation, such as the prohibition against a public entity waiving an attorney conflict of interest.

3. The Opinion of Magistrate Judge Kugler is reported as *Steel v. General Motors Corp.*, 912 F.Supp. 724 (D.N.J.1995). For the convenience of the parties, however, all references in this opinion to the opinion of Magistrate Judge Kugler are to the slip opinion.

4. N.J.S.A. §§ 56:12–29 to 12–49 (West Supp. 1995).

5. 15 U.S.C. §§ 2301–2312.

6. Article 2 of the UCC, as adopted by the New Jersey legislature, is codified at N.J.S.A. §§ 12A:2–101 to 2–725 (West 1962 & Supp. 1995).

7. N.J.S.A. §§ 56:8–1 to 8–66 (West Supp.1995).

8. From August, 1988 through March, 1993, London was employed as an associate at the Philadelphia law firm of George J. Lavin, Jr. and Associates, which subsequently became Lavin, Coleman, Finarelli & Gray (the "Lavin firm"). In March, 1993, he left the Lavin firm and joined the firm of Harvey, Pennington, Herting, & Rennelsen ("Harvey Pennington") as a litigation associate. In April, 1994, he left the Harvey Pennington firm and joined the firm of McBreen, McBreen & Kopko (the "McBreen firm"). From March 1990 through March, 1993, while associated with the Lavin firm, London worked on "lemon law" cases on behalf of GM. While with the McBreen firm, from August 1994 until his resignation on May 26, 1996, London represented GM on a number of lemon law cases, many of which also involved Kimmel & Silverman as plaintiffs' counsel.

Subject to an "ethics screen" which K & S "constructed" to avoid a conflict of interest, London began work at K & S on June 7, 1995. The "ethics screen" was designed to prevent London from having any contact with cases involving GM. The facts surrounding the implementation of the "ethics screen" are fully set forth in Judge Kugler's Opinion and will not be repeated here, except where necessary to explain specific factual findings which are challenged on these appeals.

On August 4, 1995, defendant, General Motors Corporation, moved to disqualify London and the firm of K & S in the cases then pending against GM which were filed after London began work at K & S. Between August 17, and September 15, 1995, Magistrate Judge Kugler conducted five days of hearings on GM's disqualification motion. On December 5, 1995, Magistrate Judge Kugler filed his Opinion and separate Orders disqualifying London and the K & S firm from further representing plaintiffs in the cases then pending before him. In November, 1995, approximately five months after he began working there, London ended his employment with K & S. On December 22, 1995, London and K & S filed these appeals.

## II. Standard of Review

■ A United States Magistrate Judge may "hear and determine any [non-dispositive] pretrial matter pending before the court" pursuant to 28 U.S.C. § 636(b)(1)(A). In all non-dispositive pre-trial matters, a magistrate judge may issue an opinion and order. Under the authority granted by 28 U.S.C. § 636(b)(1)(B), a magistrate also "may conduct hearings, including evidentiary hearings," into dispositive matters, and submit "proposed findings of fact and recommendations for the disposition" of the matter to the district court. *See generally* 12 Charles A. Wright, et al., *Federal Practice and Procedure* § 3076.5 (Supp.1996). The distinction between an order and a recommendation is meaningful to the district court's standard of review. Findings and recommendations of a magistrate are subject to *de novo* review under § 636(b)(1)(B). On the other hand, under § 636(b)(1)(A), a district court may only "reconsider [a] pretrial matter . . . where it has been shown that the magistrate's order is clearly erroneous or contrary to law." *See United Steelworkers of America v. New Jersey Zinc,* 828 F.2d 1001 (3d Cir.1987).[9]

■ A magistrate judge's ruling is "clearly erroneous when, although there is evidence to support it, the reviewing Court . . . is left with a definite and firm conviction that a mistake has been made." *South Seas Catamaran, Inc. v. M/V Leeway,* 120 F.R.D. 17, 21 (D.N.J.1988) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)), *aff'd,* 993 F.2d 878 (3d Cir.1993). The party filing the notice of appeal bears the burden of demonstrating that the magistrate judge's decision was clearly erroneous or contrary to law. *Exxon Corp. v. Halcon Shipping Co., Ltd.,* 156 F.R.D. 589, 591 (D.N.J.1994).

■ Under the clearly erroneous standard of review, "the magistrate judge's findings should not be rejected even if a reviewing court could have decided the issue differently." *Toth v. Alice Pearl, Inc.,* 158 F.R.D. 47, 50 (D.N.J.1994) (citing *Anderson v. City of Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) ("Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous.")).

## III. Discussion

■ In interpreting the Rules of Professional Conduct, the United States District Court for the District of New Jersey is guided by "definitive state court decision[s] interpreting the rules." Allyn Z. Lite, *New Jersey Federal Practice Rules, 1996 Edition,* cmt. to Rule 6, at 35 (1995). In the absence of such a ruling from the state courts, "the

9. The standard of review provided in § 636, which is applicable to these appeals, is echoed in the Federal Rules of Civil Procedure. *See* Fed. R.Civ.P. 72(a) ("The district judge . . . shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law."). Rule 40.D.4(a) of the General Rules of the United States District Court for the District of New Jersey also incorporates this standard of review.

federal Court will proceed to reach its own conclusion." *Id.*

### A. *Substantially Related Matters*

■ London contends that his disqualification under RPC 1.9(a)(1) was improper, because the cases presently before the court are not "substantially related" to the matters in which London represented GM while employed at the Lavin and McBreen firms. In support of this argument, appellants rely primarily on an opinion of the New Jersey Supreme Court Advisory Committee on Professional Ethics ("ACPE") interpreting RPC 1.9(a)(1), which bases a finding of a "substantial relationship" upon a "factual nexus" between the side-switching attorney's present case and the cases he or she worked on during the former representation. N.J.Adv. Comm. on Ethics Opinion No. 654, 129 N.J.L.J. 514 (1991). Appellants assert that such a factual nexus is absent in the cases now on appeal. Magistrate Judge Kugler, however, rejected this narrow reading of RPC 1.9(a)(1), choosing to rely on the "substantial relationship" test articulated by the New Jersey Supreme Court in *Reardon v. Marlayne, Inc.*, 83 N.J. 460, 416 A.2d 852 (1980).

In Opinion No. 654, the ACPE found it significant that *Reardon* was decided before the New Jersey Supreme Court adopted the Rules of Professional Conduct in 1984. The *Reardon* formulation of the "substantial relationship" test required disqualification when there was a "substantial relationship between the subject matter of the present suit and that of cases worked on during the former representation." *Reardon,* 83 N.J. at 474, 416 A.2d 852. The current rule, however, bans subsequent representation in "the same or a substantially related matter." RPC 1.9(a)(1). The ACPE found the *Reardon* language to be "somewhat broader" than the current rule. The ACPE noted that, in *Dewey v. R.J. Reynolds Tobacco Co.,* 109 N.J. 201, 536 A.2d 243 (1988), the New Jersey Supreme Court determined that RPC 1.9, in effect, replaced the *Reardon* three-part test for attorney disqualification. *Id.* at 212, 536 A.2d 243 (citing *Reardon,* 83 N.J. at 470, 416 A.2d 852.)

The *Dewey* court, however, only addressed whether the attorney had "represented" a party with interests adverse to the client of his new firm, within the meaning of RPC 1.9(a). As Magistrate Judge Kugler recognized, there was no discussion in *Dewey* of the proper standard for finding a "substantial relationship."

> The *Dewey* court did not hold that *Reardon* was bad law; rather, it held that disqualification motions based on current representation of clients with interests adverse to those of a former client were now to be analyzed under the language of RPC 1.9, as opposed to the three prongs set forth by Reardon. This does not mean that the reasoning of *Reardon* does not also support the language of the rule. In fact, the *Dewey* court recognized that much of the discussion in *Reardon* was consistent with the language of the new rules. And, since the *Dewey* court did not address the point of what test should be used to determine what is a "substantially related matter," this court is left to conclude that the reasoning of *Reardon* on this issue survives, if not as black-letter law, then at least for guidance on the factors that this court should consider in a determination of what is a "substantially related matter."

Opinion of Magistrate Judge Kugler at 27–28 (footnote omitted). Magistrate Judge Kugler is correct that *Dewey* in no way compels the conclusion that the "substantial relationship" analysis articulated in *Reardon* is no longer good law in New Jersey.

■■ An opinion of the ACPE is not a "definitive state court decision interpreting the rules." Lite, *supra.* While an ACPE opinion is certainly persuasive, when it conflicts with a decision of a state court, it must give way. Opinion No. 654, in its attempt to narrow the "substantial relationship" test to instances of a "factual nexus," misconstrues *Dewey,* and is without support in the New Jersey case law. In fact, the broad application of RPC 1.9 has been reaffirmed since the adoption of the Rules. *See, e.g., G.F. Indus. v. American Brands,* 245 N.J.Super. 8, 13–14, 583 A.2d 765 (App.Div.1990) (upholding disqualification under RPC 1.9(a), noting that

"New Jersey has chosen to strictly construe" RPC 1.9, and quoting *Reardon* to the effect that all doubts must be resolved in favor of disqualification).

There is no doubt that each lemon law case presents distinct facts concerning the precise defect which is alleged in each instance. It is also undoubtedly true, as Magistrate Judge Kugler pointed out, that "[i]t is illogical to suggest that each new lemon law case is a creature of a different stripe, presenting unfamiliar circumstances to an experienced lemon law attorney." Opinion of Magistrate Judge Kugler at 32. It is equally illogical to demand a factual nexus when the facts, *i.e.*, the alleged mechanical or electrical defect in the vehicle, do not "drive" the decision to settle, or litigate a given case. When the facts, as in lemon law cases, "take the back seat," the absence or presence of a "factual nexus" between the former representation and the current one, cannot be dispositive.

Lemon law cases certainly present almost identical legal issues, regardless of the precise nature of the defect alleged in each case. Yet, a rule that defines "substantial relationship" to require no more than a similarity of legal issues would sweep too broadly. Although "[g]allons of ink have been consumed" in determining what the "substantial relationship" test compares, "the fundamental idea ... seems to be *information.*" ABA/BNA Lawyer's Manual on Professional Conduct at 51:215 (1996). Indeed, the case law reveals that disqualification is proper when the "similarity in the two representations is enough to raise a common-sense inference that what the lawyer *learned* from his former client will prove useful in his representation of another client whose interests are adverse to those of the former client." *Id.* (emphasis added)

In *Kaselaan & D'Angelo Associates, Inc. v. D'Angelo*, 144 F.R.D. 235 (D.N.J.1992), Judge Simandle carefully analyzed the New Jersey case law, relying, in part, on *Gray v. Commercial Union Ins. Co.*, 191 N.J.Super. 590, 468 A.2d 721 (App.Div.1983).

Recognizing that plaintiff's attorney's long-standing relationship with Commercial Union would necessarily have made him privy to confidential and proprietary information of Commercial Union, including its claims and litigation philosophy, its methods and procedures for defending claims and litigation, and its information regarding the administration of various business operations, the court held that plaintiff's attorney could use such information to the substantial disadvantage of his former client Commercial Union. Thus, a substantial relationship was established even though such general information may not have been specifically relevant to the merits of the employment contract dispute.

*Kaselaan & D'Angelo*, 144 F.R.D. at 240–41.

London was in the identical position vis-à-vis GM as was Gray vis-à-vis Commercial Union Insurance. It is precisely because GM's claims and litigation philosophy and its methods and procedures for defending claims were known to London, combined with the fact that lemon law cases, while not factually identical, are undeniably similar, that each of the cases pursued by K & S must be deemed a "substantially related" matter to the cases London handled while representing GM in his prior employment. Accordingly, Magistrate Judge Kugler's decision to disqualify London under RPC 1.9(a)(1) was not clearly erroneous or contrary to law.[10]

### B. The Appearance of Impropriety

When New Jersey adopted the Rules of Professional Conduct in 1984, it added subsection 1.9(b), incorporating by reference the prohibitions of RPC 1.7(c). RPC 1.7(c), in pertinent part, mandates that:

in certain cases or situations creating an appearance of impropriety rather than an actual conflict, multiple representation is not permissible, that is, in those situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the multiple representation poses substantial risk of disservice to either the

---

**10.** Because this court has concluded that London's disqualification under RPC 1.9(a)(1) was appropriate, there is no need to decide whether London could also have been disqualified under RPC 1.9(a)(2).

public interest or the interest of one of the clients.

RPC 1.7(c)(2). This rule, although written for the "multiple representation" situation, is applicable to the "former client" conflict by virtue of its incorporation into RPC 1.9(b).

Although Magistrate Judge Kugler concluded that London's representation of plaintiffs bringing suit against GM presented an "actual conflict" under RPC 1.9(a), he also analyzed the circumstances of the representation under the "appearance of impropriety" standard. Opinion of Magistrate Judge Kugler at 38–43.

Under RPC 1.7(c)(2), if, when viewed from the perspective of the "ordinary knowledgeable citizen," the representation "poses substantial risk" of disserving the public or the attorney's present or former client, the representation will not be allowed. Magistrate Judge Kugler set forth the following facts as they would appear to the ordinary knowledgeable citizen:

> Mr. London represented GM for approximately five years while at the Lavin and McBreen firms. During that time, he worked on over fifty lemon law cases, gaining extensive knowledge and experience in GM vehicles, the GM organization, the GM decision-making process and hierarchy, and GM's approach to litigating or settling lemon law claims. He worked closely with and formed a close professional relationship with GM legal and technical personnel, and had access to GM's electronic mail system. Ms. Adams trusted Mr. London "implicitly" and provided him with information over the course of their professional relationship with the expectation that any confidences and secrets would be protected by the attorney-client relationship and Mr. London's ethical obligations to GM.

Opinion of Magistrate Judge Kugler at 42.

In *G.F. Industries v. American Brands,* the Appellate Division considered whether a law firm which had previously represented Sunshine Biscuits, while Sunshine was a subsidiary of American Brands, should be disqualified from representing American Brands in a suit brought against it by the purchaser of Sunshine Biscuits, arising out of the pur-chaser's dissatisfaction with the sale. On appeal from an order requiring its disqualification, the law firm objected that it had not actually represented Sunshine in the sale. Nevertheless, the Appellate Division found that the facts of the case would lead "an ordinary knowledgeable citizen to conclude that a substantial 'risk of disservice' is threatened." *G.F. Indus.,* 245 N.J.Super. at 15, 583 A.2d 765.

The Appellate Division stressed the importance of "the actual information [counsel] acquired" relating to Sunshine, in finding an appearance of impropriety. *Id.* at 16, 583 A.2d 765. Similarly, London's case reeks of the appearance of impropriety because of the "actual information" London possessed. London had not only established a close working relationship with several GM employees in the course of his representation of the automaker, he also had standing authority to settle cases on its behalf, authority which was very sparingly granted by GM. Opinion of Magistrate Judge Kugler at 8. Accordingly, even if Magistrate Judge Kugler's disqualification of London under RPC 1.9(a) were not well supported by the record, London merited disqualification under RPC 1.9(b) because of the substantial risk of disservice to the public interest and to the interest of GM.

Counsel for Appellants has advanced the proposition that the "appearance of impropriety doctrine" embodies "an arbitrary and vague standard." Appellants' Letter Brief, dated July 23, 1996, at 1. This challenge to the doctrine has frequently been made. *See, e.g.,* Cynthia M. Jacob, *A Polemic Against R.P.C. 1.7(c)(2): The "Appearance of Impropriety" Rule,* N.J. Lawyer Magazine, June 1996, at 23. This argument, however, underestimates the capacities of the "ordinary knowledgeable citizen" who elects our federal, state and local governments, sits on our juries, and educates our children. What would such a citizen think upon discovering that a lawyer, Mr. London, who had represented GM at two separate law firms, over a period of five years, and had become familiar with its litigation and settlement strategies, and had formed a close professional relationship with GM's legal personnel, suddenly

"switched sides" to join a law firm which regularly sued GM and had, in fact, been on the other side of cases in which London had represented GM.

The answer, I respectfully suggest, would be the same answer given by Magistrate Judge Kugler. At the heart of every "side-switching attorney" case is the suspicion that by changing sides, the attorney has breached a duty of fidelity and loyalty to a former client, a client who had freely shared with the attorney secrets and confidences with the expectation that they would be disclosed to no one else. It is for this reason that the "appearance of impropriety doctrine" was adopted to protect the public, our profession, and those it serves. In short, this much maligned doctrine exists to engender, protect and preserve the trust and confidence of clients. As one court aptly put it:

> Now, it is the glory of our profession that its fidelity to its client can be depended on; that a man may safely go to a lawyer and converse with him upon his rights or supposed rights in any litigation with the absolute assurance that that lawyer's tongue is tied from ever disclosing it; and any lawyer who proves false to such an obligation, and betrays or seeks to betray any information or any facts that he has attained while employed on the one side, is guilty of the grossest breach of trust. I can tolerate a great many things that a lawyer may do,—things that in and of themselves may perhaps be criticised or condemned when done in obedience to the interest or supposed interest of his own client, and when he is seeking simply to protect and uphold those interests. If he goes beyond, perhaps, the limits of propriety, I can tolerate and pass that by; but I cannot tolerate for a moment, neither can the profession, neither can the community, any disloyalty on the part of a lawyer to his client. In all things he must be true to

that trust, or, failing it, he must leave the profession.

*United States v. Costen,* 38 F. 24, 24 (C.C.D.Colo.1889).

On the facts of these cases, there is nothing vague or arbitrary about the application of the "appearance of impropriety" doctrine to the conduct of London or to K & S. So much for "polemics."

### C. Mootness

■ In opposition to the imputed disqualification of K & S, appellants first contend that London's departure from the firm in November, 1995, rendered Magistrate Judge Kugler's decision moot,[11] and that, therefore, K & S should be allowed to resume their representation of plaintiffs, Sebastian Cardona and Louis Marazzo. In support of this contention, appellants argue that the "sole basis for Kimmel & Silverman's disqualification is Rule 1.10(b)," and that R.P.C. 1.10(b) only applies when an attorney who has formerly represented an adverse party "becomes associated with a firm." Appellants' Brief at 6. This is not quite correct. Magistrate Judge Kugler concluded that K & S was disqualified under both RPC 1.10(a) and RPC 1.10(b). Opinion at 47–48, nn. 14–15. The New Jersey Supreme Court has clearly chosen to apply RPC 1.10(a) to cases of "side-switching attorneys." *See Dewey,* 109 N.J. at 217, 536 A.2d 243; *Lawler v. Isaac,* 249 N.J.Super. 11, 17–18, 592 A.2d 1 (App. Div.1991).[12]

K & S poses the following question: irrespective of whether RPC 1.10(a) or (b) requires disqualification of the firm, how long does the imputed disqualification last after the side-switching attorney has left the firm? In substance, K & S contends that the reasoning that led Magistrate Judge Kugler to impute disqualification to K & S, *i.e.,* that all

---

11. Appellants use the term "mootness" to mean that there is, in their view, no longer any reason for disqualification. As the court understands appellant's position, the term is not used in the sense of Article III "mootness," in that there remains a live controversy, and the parties have a "legally cognizable interest in the outcome." *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969).

12. Because New Jersey courts have applied this broad rule of imputed disqualification to cases of the side-switching attorney, it cannot be said that Magistrate Judge Kugler's decision to apply RPC 1.10(a) in these cases was clearly erroneous or contrary to law.

Lemon Law cases against GM are "substantially related," suggests that the imputed disqualification continues indefinitely. Thus, K & S urges this court to adopt a prophylactic rule that the imputed disqualification of a "tainted" law firm "evaporates" upon the departure of the side-switching attorney, or within some fixed time thereafter. In support of this contention, K & S points to New Jersey's six-month period of personal disqualification for former deputy attorneys general and former assistant county prosecutors. *See In the Matter of Petition for Review of Opinion No. 569,* 103 N.J. 325, 511 A.2d 119 (1986) (deputy attorneys general); *In re Advisory Opinion on Professional Ethics No. 361,* 77 N.J. 199, 207, 390 A.2d 118 (1978) (assistant county prosecutors), *Cf. N.J.Adv.Comm. on Prof. Ethics Opinion 525,* 113 N.J.L.J. 365 (1984) (fashioning a "six-month rule" for private attorneys switching law firms in mass-tort asbestos litigation).

These decisions, however, involved the "appearance of impropriety" standard of disqualification. Although there are sound policy reasons in some cases for formulating a *per se* rule that a disqualification based upon the "appearance of impropriety" standard "evaporates" after six months, it does not follow that a similar rule should be adopted for all cases of imputed disqualification, even for all cases of disqualification based upon an "appearance of impropriety." For example, as a matter of public policy, a "six-month rule" may be appropriate in cases involving former government attorneys, in order to allow public entities to continue to attract qualified attorneys into government service. On the facts presented on these appeals, however, this court need not formulate such a prophylactic rule. That issue is not before the court, and its resolution must be left for another day.

Moreover, appellants' suggestion that the date of London's departure from K & S should definitively mark the "evaporation" of the imputed disqualification of the law firm is impractical as a rule of professional conduct. The rule advanced by K & S would mean that in every case of imputed disqualification, the disqualified law firm would be able to cleanse itself of its "taint" simply by dismissing the side-switching lawyer.[13] Such a rule would not provide any disincentive to a law firm that contemplates hiring an attorney who has formerly represented an adverse party.

The decision whether to disqualify a law firm by imputation is best undertaken on a case-by-case basis, weighing the facts as they exist at the time the motion to disqualify is made. New Jersey courts have consistently eschewed *per se* rules of disqualification, stressing the "fact-sensitive nature" of a decision to disqualify counsel. *Dewey,* 109 N.J. at 220, 536 A.2d 243. *Cf. Petition for Review of Opinion 552,* 102 N.J. 194, 205–06, 507 A.2d 233 (1986) (rejecting *per se* rule of disqualification in multiple representation situations, in favor of a case-by-case approach).

### D. The Ethics Screen

K & S further contends that, in this case, imputed disqualification under RPC 1.10 is improper because K & S had put in place an "ethics screen" which was designed to prevent London from becoming involved with, or profiting financially from, the cases K & S prosecuted against General Motors.

Appellants contend that "ethics screens" have been approved, outside of the government lawyer context,[14] in New Jersey. Appellant's Brief at 9. Appellants do not, because they cannot, point to any definitive interpretation of the Rules of Professional Conduct by a New Jersey Court approving the use of an "ethics screen" in the case of a "side-switching attorney." In the absence of such a decision, appellants cite ten separate opinions of the ACPE. In some of these advisory opinions, the question involved insulating an attorney whose spouse had a conflict,[15] others involved the question of a former government attorney, for whom screening is explicitly approved by RPC

---

13. I do not imply that London was dismissed, but offer a hypothetical case.

14. *See* RPC 1.11.

15. *See* N.J.Adv.Comm. on Prof.Ethics Ops. Nos. 434, 508, 600.

1.11,[16] and one case involved a "side-switching" paralegal.[17] Finally, appellants rely on one opinion which clearly states that: "Our review of the expedient of a 'Chinese Wall' before the question of consent is resolved would be premature." N.J.Adv.Comm. on Ethics Opinion No. 667, 132 N.J.L.J. 522 (1992). In short, none of these Advisory Committee Opinions supports appellants' position.

"Ethics screens," in the private attorney context, are specifically provided for in the rules of some states, *see, e.g.,* Pa.R.P.C. 1.10, and have been approved by the drafters of the Restatement of the Law Governing Lawyers, *see* Restatement (Third) of Law Governing Law. § 204 (T.D. No. 4, 1991).[18] Nevertheless, "ethics screens" have never been approved in New Jersey, even if the ACPE has, on occasion, declined to comment on proposed ethics screens. *See* N.J.Adv. Comm. on Ethics Opinion No. 667, 132 N.J.L.J. 522 (1992).

By London's own admission, his research into his professional responsibilities, following his decision to join K & S, *was limited to Pennsylvania law.* Opinion of Magistrate Judge Kugler at 10. Clearly, neither London, nor K & S, researched New Jersey law, a shocking confession in light of the number of cases actually filed by K & S against GM in this court. As one court has observed, "[the New Jersey] Rules of Professional Conduct are stringently enforced, and would even appear to be stricter than those of other states." *Application of County of Bergen, N.J., for Approval to Dissolve Bergen Coun-*

ty Utilities Authority, 268 N.J.Super. 403, 633 A.2d 1017 (App.Div.1993) (citing *First Wisconsin Mortgage Trust v. First Wisconsin Corp.,* 584 F.2d 201 (7th Cir.1978) (en banc)). This is evident, especially in the area of "ethics screens," a device which New Jersey and its courts have refused to adopt, except in extremely limited circumstances.

Moreover, even if ethics screens were an accepted device in New Jersey, which they clearly are not, there is reason to suspect, based upon the record below, that the screen constructed by K & S in this case was far from impenetrable. Indeed, Magistrate Judge Kugler points to lapses in the administration of the ethics screen at K & S. Opinion of Magistrate Judge Kugler at 13–18.[19] While some problems may arise in implementing any new program in the workplace, K & S employed only five attorneys. Therefore, any breach in the ethical wall carried with it the very real danger that other lawyers in the firm would soon share the client confidence.

K & S insists that the ethics screen was working effectively while London was employed by them and that no GM confidences were revealed. Magistrate Judge Kugler found otherwise, and his findings are adequately supported by the record below. Opinion of Magistrate Judge Kugler at 14–18.

As one authority has noted, "[t]he practicalities of screening arrangements are their most serious weakness." Charles W. Wolfram, *Modern Legal Ethics* § 7.6.4, at 402 (West Hornbook Series 1986). "In the end

---

**16.** *See* N.J.Adv.Comm. on Prof.Ethics Ops. Nos. 460, 467, 660.

**17.** *See* N.J.Adv.Comm. on Prof.Ethics Op. No. 665.

**18.** This section provides, in pertinent part that:

The restrictions upon an affiliated lawyer specified in § 203 do not restrict that lawyer when:

(2) The restriction is of representation adverse to a former client as provided in § 213 [concerning imputed disqualification] and there is no reasonable prospect that confidential information of the former client will be used with material adverse effect on the former client because:

(a) The confidential client information communicated to the personally-prohibited law-

yer is not likely to be significant in the later case;

(b) Adequate screening measures are in effect to eliminate involvement by the personally-prohibited lawyer in the representation; and

(c) Timely and adequate notice of the screening has been provided to all affected clients.

**19.** Appellants argue that, as an associate, London received a salary, so that Judge Kugler's finding at 18 that no measures were taken to insulate London from fees generated by work against GM is not relevant. I am inclined to agree. Even without this observation, however, Magistrate Judge Kugler highlights several other notable lacunae, which cast doubt on the quality of Kimmel & Silverman's "ethics screen."

there is little but the self-serving assurance of the screening-lawyer foxes that they will carefully guard the screened-lawyer chickens." *Id.*

In these cases, the failure of London and K & S to consult New Jersey law before filing over twenty cases in this court was their undoing. Unfortunately, by proceeding in reckless disregard of the New Jersey Rules of Professional Conduct, the consequences of this self-inflicted wound have also been visited upon their innocent clients. To prevent prejudice to the plaintiffs, I shall stay these cases for a period of thirty days to allow plaintiffs to obtain new counsel. K & S, however, is immediately disqualified from any further representation of plaintiffs. If plaintiffs are unable to obtain new counsel within thirty days, I will consider extending the stay for an additional period of time, or entertain an application from plaintiffs for the appointment of counsel pursuant to the provisions for the *Appointment of Attorneys in Pro Se Civil Actions* incorporated into Appendix H to the General Rules of the United States District Court for the District of New Jersey.

## IV. Conclusion

For the reasons set forth above, the court will affirm the Orders of Magistrate Judge Kugler, filed on December 5, 1995, in the above-captioned matters.