**[This opinion has been published in *Ohio Official Reports* at 81 Ohio St.3d 1.]**

KALA, APPELLEE, *v*. ALUMINUM SMELTING & REFINING COMPANY, INC., APPELLANT.

**[Cite as *Kala v. Aluminum Smelting & Refining Co., Inc.*, 1998-Ohio-439.]**

*Attorneys at law—Criteria for determining whether individual or entire law firm should be disqualified from representing a party when attorney leaves employment with firm representing a party and joins law firm representing opposing party.*

In ruling on a motion for disqualification of either an individual (primary disqualification) or the entire firm (imputed disqualification) when an attorney has left a law firm and joined a firm representing the opposing party, a court must hold an evidentiary hearing and issue findings of fact using a three-part analysis:

(1)     Is there a substantial relationship between the matter at issue and the matter of the former firm's prior representation;

(2)     If there is a substantial relationship between these matters, is the presumption of shared confidences within the former firm rebutted by evidence that the attorney had no personal contact with or knowledge of the related matter; and

(3)     If the attorney did have personal contact with or knowledge of the related matter, did the new law firm erect adequate and timely screens to rebut a presumption of shared confidences with the new firm so as to avoid imputed disqualification?

(No. 96-1283—Submitted September 10, 1997—Decided January 21, 1998.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 69710.

————————————

{¶ 1} Plaintiff-appellee, Sher S. Kala, retained attorney Michael Pearson and the law firm of Spangenberg, Shibley & Liber ("Spangenberg") to represent him in a lawsuit against appellant Aluminum Smelting & Refining Co., Inc. ("Aluminum Smelting"), his former employer. In the 1993 lawsuit, Kala alleged, *inter alia*, that Aluminum Smelting had wrongfully terminated his employment on the basis of age. Richard C. Hubbard III of the law firm of Duvin, Cahn & Hutton ("Duvin") represented the appellant.

{¶ 2} Pearson had co-counsel, but he alone represented Kala at his deposition on July 12 and 23, 1994, and conducted most of the trial. Ellen Sacks, Pearson's first co-counsel, withdrew immediately before trial without explanation and Justin Madden was substituted. The case went to trial in September 1995, resulting in a directed verdict for Aluminum Smelting.

{¶ 3} On behalf of Kala, Pearson filed an appeal on October 20, 1995. Pearson stayed in contact with Kala during the appeal and participated in settlement discussions with Kala in preparation for a prehearing settlement conference with the Eighth District Court of Appeals on November 13, 1995, according to Kala's brief in the Supreme Court. Kala had numerous conversations with Pearson during the litigation in which Kala relied on the fact that his conversations were confidential. Kala does not contend that Pearson has ever disclosed any confidences that Kala entrusted to him.

{¶ 4} It is undisputed that, on January 8, 1996, after he had obtained an extension of time for filing Kala's brief, Pearson announced his intention to leave the Spangenberg law firm and to join Duvin. In a memo to all Duvin attorneys on January 16, 1996, Steven Aronoff, an attorney with Duvin, asked the attorneys to make him aware of any cases which they were handling against the Spangenberg law firm so that Duvin could institute a "Chinese wall" prior to Pearson's joining the Duvin firm. A memo to the file from Steven Aronoff noted that Duvin was sending the trial file to an off-site storage location, and when an attorney requested

it, the trial file would be sent back to the office and the requesting attorney would be required to sign for the file. In addition, the entire appellate file was maintained in Hubbard's office and was accessible to Duvin attorneys only through him.

{¶ 5} On January 19, 1996, Aronoff sent a letter to attorney Peter Weinberger at the Spangenberg firm regarding the steps taken to insulate Pearson from any contact with the pending appeal. The letter informed the Spangenberg firm that Pearson had not discussed with his new firm any of his substantive legal work or any confidential client information learned while at the Spangenberg firm, and had been instructed not to do so in the future. In addition, it stated, all of the attorneys at Duvin had been instructed not to discuss with Pearson any aspect of cases pending in the Spangenberg office or to share any documents or other information concerning those cases. Further, the letter assured the Spangenberg law firm that all concerned were mindful of and intended to abide by all of the ethical considerations relevant to the transition. In addition, Aronoff noted that Duvin had canvassed its attorneys in order to identify any cases in which there may have been a substantial relationship between the subject matter of Spangenberg's representation during Pearson's tenure there and Duvin's current clients, including any active cases. The letter also stated, "We *will institute* further procedures" to protect client disclosures. (Emphasis added.)

{¶ 6} On January 22, 1996, Pearson voluntarily left the Spangenberg firm to accept a position of associate attorney with Duvin. On January 29, 1996, Pearson stated in an affidavit that he agreed to abide by all ethical and professional requirements in his transition from Spangenberg to Duvin. Further, he stated that he would not discuss the substantive work he did while at Spangenberg that involved client confidences. Pearson stated that he had not spoken with any member of Duvin about such matters. In addition, he noted that in regard to the Kala case, he had not discussed any substantive issues regarding that case with anyone at Duvin, nor had anyone at Duvin tried to discuss those matters with him.

He also noted that Lee Hutton, a partner at Duvin, had specifically instructed him not to discuss these issues with any member or associate or staff or client of Duvin.

{¶ 7} On April 12, 1996, after Kala requested several extensions to file his appellate brief, Kala filed a motion to disqualify Duvin, alleging a conflict of interest. On May 10, 1996, the court, without opinion, ordered the disqualification of Duvin. Duvin filed a motion to reconsider on May 20, 1996, but on May 28, 1996, the court of appeals denied the motion, leaving intact the order disqualifying Duvin.

{¶ 8} This cause is now before this court pursuant to the allowance of a discretionary appeal.

_____

*Spangenberg, Shibley & Liber* and *Justin F. Madden*, for appellee.
*Duvin, Cahn & Hutton*, *Robert P. Duvin* and *Robert M. Wolff*, for appellant.

_____

**LUNDBERG STRATTON, J.**

{¶ 9} The issue before the court is whether a law firm should be automatically disqualified from representing a party when an attorney leaves his or her former employment with a firm representing a party and joins the law firm representing the opposing party, or whether that law firm may overcome any presumption of shared confidences by instituting effective screening mechanisms. Although this issue has been dealt with in many other jurisdictions, this is a case of first impression for Ohio. To fairly decide this issue, we must consider the Disciplinary Rules and Ethical Considerations in the Ohio Code of Professional Responsibility, competing public policy interests, and the guidance provided by federal case law.

## I. FINAL APPEALABLE ORDER

{¶ 10} As a preliminary matter, although not raised by counsel, we must decide whether this matter is a final appealable order. We conclude that it is, and

adopt the well-reasoned decision in *Stevens v. Grandview Hosp. & Med. Ctr.* (Oct. 20, 1993), Montgomery App. No. 14042, unreported, 1993 WL 420127. See, also, *Russell v. Mercy Hosp.* (1984), 15 Ohio St.3d 37, 42-43, 15 OBR 136, 140-141, 472 N.E.2d 695, 698-700.

## II.    ETHICAL PRINCIPLES

{¶ 11} As a starting principle, a court has inherent authority to supervise members of the bar appearing before it;  this necessarily includes the power to disqualify counsel in specific cases. *Morgan v. N. Coast Cable Co.* (1992), 63 Ohio St.3d 156, 161, 586 N.E.2d 88, 92.

{¶ 12} A fundamental principle in the attorney-client relationship is that the attorney shall maintain the confidentiality of any information learned during the attorney-client relationship.  A client must have the utmost confidence in his or her attorney if the client is to feel free to divulge all matters related to the case to his or her attorney.

{¶ 13} DR 4-101, Preservation of Confidences and Secrets of a Client, sets forth the following requirements for an attorney-client relationship:

"(A)  'Confidence' refers to information protected by the attorney-client privilege under applicable law, and 'secret' refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.

"(B)   Except when permitted under DR 4-101(C), a lawyer shall not knowingly:

"(1)  Reveal a confidence or secret of his client.

"(2)  Use a confidence or secret of his client to the disadvantage of the client.

"(3)  Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure."  See, also, Canon 4 of the Code of Professional Responsibility.

**{¶ 14}** The obligation of an attorney to preserve the confidences and secrets of the client continues even after the termination of the attorney's employment. EC 4-6.[1] In addition, DR 5-105 establishes when an attorney must refuse to accept or continue employment if the interests of another client may impair the independent professional judgment of the attorney and also speaks to imputed disqualification:

"(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C).

"* * *

"(D) If a lawyer is required to decline employment or to withdraw from employment under DR 5-105, *no partner or associate of his or his firm may accept or continue such employment.*" (Emphasis added.) See, also, American Bar Association Model Rules of Professional Conduct (1994), Rule 1.10; American Bar Association Standing Committee on Ethics and Professional Responsibility, Formal Opinion No. 33, 1931.

**{¶ 15}** In addition, an attorney should avoid even the appearance of impropriety. Canon 9 of the Code of Professional Responsibility; see, also, DR 9-101. Because of the importance of these ethical principles, it is the court's duty to safeguard the preservation of the attorney-client relationship. See *Am. Can Co. v. Citrus Feed Co.* (C.A.5, 1971), 436 F.2d 1125, 1128; *Freeman v. Chicago Musical*

---

1. In its response to the motion to disqualify, filed on April 22, 1996, Duvin stated:

"The appellate brief filed by Plaintiff-Appellant raises a few errors alleged to have occurred, but any 'confidences' or trial strategies are irrelevant to those matters. In view of the fact that the trial of these issues has been concluded, it is clear that any issue of client confidences is long since passed."

However, we fail to see, particularly when a directed verdict at trial is the matter on appeal, how the issue of client confidences has "long since passed." A successful appeal demands an intimate knowledge of the facts of the case and requires ongoing representation. In addition, if the appeal is successful and the directed verdict is overturned, this matter would return to the trial court for a new trial.

*Instrument Co.* (C.A.7, 1982), 689 F.2d. 715, 721.  In doing so, a court helps to maintain public confidence in the legal profession and assists in protecting the integrity of the judicial proceeding.  *United States v. Agosto* (C.A.8, 1982), 675 F.2d 965, 969.

{¶ 16} When an attorney leaves his or her former employment and becomes employed by a firm representing an opposing party, a presumption arises that the attorney takes with him or her any confidences gained in the former relationship and shares those confidences with the new firm.  This is known as the presumption of shared confidences.  Some courts have held that such a change of employment results in an *irrebuttable* presumption of shared confidences that necessitates the disqualification of the attorney (primary disqualification) and the entire new firm (imputed disqualification).  *Cardona v. Gen. Motors Corp.* (D.N.J.1996), 942 F.Supp. 968, 969;  *G.F. Industries, Inc.  v. Am. Brands, Inc.* (1990), 245 N.J.Super. 8, 583 A.2d 765.

### III.    CLIENT'S RIGHT TO CHOOSE COUNSEL

{¶ 17} Balanced against the former client's interest in preventing a breach of confidence is the public policy interest in permitting the opposing party's continued representation by counsel of his or her choice.  Disqualification interferes with a client's right to choose counsel.  *Manning v. Waring, Cox, James, Sklar & Allen* (C.A.6, 1988), 849 F.2d 222, 224.  In *Freeman*, the court recognized the serious consequences of disqualification:

"[D]isqualification, as a prophylactic device for protecting the attorney-client relationship, is a drastic measure which courts should hesitate to impose except when absolutely necessary.  A disqualification of counsel, while protecting the attorney-client relationship, also serves to destroy a relationship by depriving a party of representation of their own choosing."  *Freeman*, 689 F.2d at 721.

**{¶ 18}** This issue has become increasingly important as the practice of law has changed. A review of the historical development of disqualification issues reveals the early conflicts created by the clash of the above principles.

IV.     HISTORY OF MOTIONS TO DISQUALIFY

**{¶ 19}** Many of the early disqualification cases arose out of charges of conflict of interest where government attorneys left the public service and went into private practice.[2] Early courts struggled with the need to fashion a rule that would preserve the confidences of the government client yet not discourage able attorneys from entering public service through fear of being locked forever into government service, unable to change positions. As the Court of Appeals for the Seventh Circuit noted:

"If past employment in government results in the disqualification of future employers from representing some of their long-term clients, it seems clearly possible that government attorneys will be regarded as 'Typhoid Marys.' Many talented lawyers, in turn, may be unwilling to spend a period in government service, if that service makes them unattractive or risky for large law firms to hire." *LaSalle Natl. Bank v. Lake Cty.* (C.A.7, 1983), 703 F.2d 252, 258.

**{¶ 20}** As more and more private attorneys also began changing firms, motions to disqualify under the irrebuttable presumption of shared confidences increased, and inequities and abuses also began to surface. While some of these motions to disqualify were legitimate and necessary, such motions were also often misused to harass an opponent, disrupt the opponent's case, or to gain a tactical advantage, and therefore were viewed with increasing caution.

**{¶ 21}** As a result, several federal cases began fashioning a way to deal with the competing interests caused by increased mobility of attorneys and the rise of

---

2. For an excellent history of the development of motions to disqualify, see Bateman, Return to the Ethics Rules as a Standard for Attorney Disqualification: Attempting Consistency in Motions for Disqualification by the Use of Chinese Walls (1995), 33 Duq.L.Rev. 249.

motions to disqualify. The Court of Appeals for the Sixth Circuit in *Manning* summed up the changing practice of law as follows:

"Perhaps these motions have become more numerous simply because the changing nature of the manner in which legal services are delivered may present a greater number of potential conflicts. Certainly, the advent of law firms employing hundreds of lawyers engaging in a plethora of specialties contrasts starkly with the former preponderance of single practitioners and small firms engaging in only a few practice specialties. In addition, lawyers seem to be moving more freely from one association to another, and law firm mergers have become commonplace. At the same time that the potential for conflicts of interest has increased as the result of these phenomena, the availability of competent legal specialists has been concentrated under fewer roofs.

"Consequently, these new realities must be at the core of the balancing of interests necessarily undertaken when courts consider motions for vicarious disqualification of counsel." *Manning*, 849 F.2d at 224-225.

{¶ 22} In *Analytica, Inc. v. NPD Research, Inc.* (C.A.7, 1983), 708 F.2d 1263, a strong dissent recognized at 1275 the devastating effect even a *charge* of disqualification could have and foretold the trend of future case law in urging the abandonment of the irrebuttable presumption of shared confidences and automatic disqualification:

"In the absence of stipulated facts supporting disqualification, decisions to disqualify counsel should be made only after a factual inquiry has been undertaken allowing lawyers an opportunity to rebut all inferences of unethical conduct. The *opportunity* to rebut inferences of professional misconduct or impropriety must exist, whether the disqualification motion is directed toward an individual lawyer or an entire firm. The majority's irrebuttable presumption is a relic from days long ago past, ignoring the realities of the modern practice of law. '[E]quity demands, and the pragmatics of emerging specialization inherent in contemporary legal

practice dictates, that this presumption be rebuttable.' *City of Cleveland v. Cleveland Elec. Illuminating,* 440 F.Supp. 193, 209 (N.D.Ohio), *aff'd mem.*, 573 F.2d 1310 (6th Cir.1977), *cert. denied*, 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978).  The time has come to abandon the irrebuttable presumption that the knowledge of one attorney is the knowledge of the entire firm since, as this court recently stated, we should look to the living law, not to that of the dead.  See *Norris v. United States,* 687 F.2d 899, 904 (7th Cir.1982)." (Emphasis *sic.*)  *Id.* at 1277-1278.

{¶ 23} As a result of the changing legal profession, federal courts and the ABA Model Rules of Professional Conduct began allowing the use of various mechanisms to isolate an attorney who had transferred employment.  Although originally applied only to government attorneys, these mechanisms have now been extended to situations involving transfers of private counsel as well.[3]

---

3. The American Bar Association first addressed this issue in American Bar Association Standing Committee on Ethics and Professional Responsibility (1985), Formal Opinion 76-342, Nov. 24, 1975, which allowed such transfers without imputed disqualification, subject to the former government employer's approval of screening procedures, followed by American Bar Association Model Rules of Professional Conduct, Rule 1.11, requiring only *notice* with appropriate screens.

The American Law Institute's latest pronouncement on this issue now states:

"Imputation * * * does not restrict an affiliated lawyer with respect to a former client conflict * * *, when there is no reasonably apparent risk that confidential information of the former client will be used with material adverse effect on the former client because * * * the personally prohibited lawyer is subject to screening measures adequate to eliminate involvement by that lawyer in representation." Restatement of the Law Governing Lawyers (1966), Section 204.  However, the American Bar Association still has not extended such recommendations to the private sector.

## V. DEVELOPMENT OF STANDARDS FOR DISQUALIFICATION

**{¶ 24}** Several federal courts in addressing both primary and imputed disqualification have devised a three-part test to determine whether disqualification is proper when one attorney leaves a firm and joins another firm representing an opposing party. We believe this test adequately covers many different scenarios and will give the courts of Ohio guidance on disqualification issues. See *Manning*, 849 F.2d at 225-226; *Freeman,* 689 F.2d at 722; *Cromley v. Bd. of Edn. of Lockport Twp. High School Dist. 205* (C.A.7, 1994), 17 F.3d 1059, 1064.

**{¶ 25}** First, a court must determine whether a substantial relationship exists between prior and present representations. If there is no substantial relationship, then no ethical problem exists. See *Uniweld Products, Inc. v. Union Carbide Corp.* (C.A.5, 1967), 385 F.2d 992. For example, when an attorney had represented a client in a trademark infringement case, the Court of Appeals for the Sixth Circuit denied disqualification in a later unrelated civil RICO case. *Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio* (C.A.6, 1990), 900 F.2d 882. See, also, *Cleveland,* 404 F.Supp. 193, in which the court held that where a one-hundred-eighty-person law firm was clearly divided into separate, unrelated divisions, there was no presumption of shared confidences and actual proof of a substantial relationship was required.

**{¶ 26}** Second, if a substantial relationship is found between the current matter and the prior matter, the court must examine whether the attorney shared in the confidences and representation of the prior matter. There is a presumption that such confidences would also be shared among members of the prior firm, but that presumption may be rebutted. *Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Lab., Inc.* (C.A.7, 1979), 607 F.2d 186, 197; *Westinghouse Elec. Corp. v. Kerr-McGee Corp.* (C.A.7, 1978), 580 F.2d 1311, 1321; *Schiessle v. Stephens* (C.A.7, 1983), 717 F.2d 417 (attorney denied contact with case and prior client;

challenging firm established by affidavit that attorney did have contact with the case and clients; presumption not rebutted).

{¶ 27} In *Freeman*, the Court of Appeals for the Seventh Circuit, in setting the rules on primary disqualification, instructed the trial court that it could "rely on any of a number of factors, among them being the size of the law firm, the area of specialization of the attorney, the attorney's position in the firm, and the demeanor and credibility of witnesses at the evidentiary hearing." *Id.*, 689 F.2d at 723.

{¶ 28} If the presumption of shared confidences within the prior firm is rebutted by such evidence, then there is again no need for primary disqualification, as there are no confidences to be shared. However, if that presumption is not rebutted, and the attorney does or is presumed to possess client confidences, primary disqualification results, and a presumption of shared confidences arises between the attorney and the members of the attorney's *new* firm. The issue then is whether a presumption of shared confidences will also disqualify the entire new firm (imputed disqualification). Kala implies that this presumption should be *irrebuttable* and that once an attorney, particularly one as involved in the case as Pearson was, moves to opposing counsel's firm, no steps can be taken to restore confidence so as to overcome the appearance of impropriety; the entire firm must be disqualified.

{¶ 29} Some courts have taken this approach. New Jersey has refused to adopt the rebuttable-presumption approach, finding that there is no way to overcome the appearance of impropriety in a "side-switching attorney" case. *Cardona*, 942 F.Supp. at 976-977. The New Jersey courts cite the impossibility of proving when a breach has been made, as those lawyers within the new firm are least likely to divulge such information. Judge Orlofsky in *Cardona* explained:

"At the heart of every 'side-switching attorney' case is the suspicion that by changing sides, the attorney has breached a duty of fidelity and loyalty to a former client, a client who had freely shared with the attorney secrets and confidences with

12

the expectation that they would be disclosed to no one else. It is for this reason that the 'appearance of impropriety doctrine' was adopted to protect the public, our profession, and those it serves. In short, this much maligned doctrine exists to engender, protect and preserve the trust and confidence of clients." *Id.* at 975. See, also, *G.F. Industries*, *supra,* 245 N.J.Super. at 16-17, 583 A.2d at 770 (hardship insufficient to overcome need to preserve high ethical standards of the profession).

{¶ 30} On the other hand, with the realities of modern-day practice, as discussed in the *Manning* case, such a hard-and-fast rule works an unfair hardship also. Ultimately, one must have faith in the integrity of members of the legal profession to honor their professional oath to uphold the Code of Professional Responsibility, safeguarded by the precautions required to rebut the presumption of shared confidences.[4] If used properly, the process of screening attorneys who possess client confidences from other members of a firm can preserve those confidences while avoiding the use of the motion to disqualify as a device to gain a tactical advantage. Therefore, we believe that the fairer rule in balancing the interests of the parties and the public is to allow the presumption of shared confidences with members of the new firm to be rebutted.[5]

{¶ 31} Thus, the third part of the test on disqualification is whether the presumption of shared confidences with the new firm has been rebutted by evidence that a "Chinese wall" has been erected so as to preserve the confidences of the client.[6] The Chinese wall is the specific institutional screening mechanisms that

---

4. The cases cited by Kala involving disqualification of judges rest on different considerations affecting the perception of impartiality by the judicial branch and thus are not applicable to *attorney* disqualification matters.

5. In doing so, we agree with the Board of Commissioners on Grievances and Discipline, Opinion 89-013 (May 30, 1989), which in an advisory opinion laid out the substantial-relationship test and the use of institutional screening mechanisms.

6. "Chinese wall" has become the legal term to describe a "procedure which permits an attorney involved in an earlier adverse role to be screened from other attorneys in the firm so as to prevent disqualification of the entire law firm simply because one member of firm previously represented a client who is now an adversary of the client currently represented by the firm." Black's Law

will prevent the flow of confidential information from the quarantined attorney to other members of the law firm.[7]

{¶ 32} Factors to be considered in deciding whether an effective screen has been created are whether the law firm is sufficiently large and whether the structural divisions of the firm are sufficiently separate so as to minimize contact between the quarantined attorney and the others, the likelihood of contact between the quarantined attorney and the specific attorneys responsible for the current representation, the existence of safeguards or procedures which prevent the quarantined attorney from access to relevant files or other information relevant to the present litigation, prohibited access to files and other information on the case, locked case files with keys distributed to a select few, secret codes necessary to access pertinent information on electronic hardware, instructions given to all members of a new firm regarding the ban on exchange of information, and the prohibition of the sharing of fees derived from such litigation. *Cromley*, 17 F.3d at 1065; *Schiessle,* 717 F.2d at 420-421 (presumption *not* rebutted because no "institutional mechanisms" were in effect to insulate quarantined attorney from rest of firm); *LaSalle,* 703 F.2d at 259; *United States v. Goot* (C.A.7, 1990), 894 F.2d 231, 235-236.

{¶ 33} A very strict standard of proof must be applied to the rebuttal of this presumption of shared confidences, however, and any doubts as to the existence of an asserted conflict of interest must be resolved in favor of disqualification in order to dispel any appearance of impropriety. *LaSalle*, 703 F.2d at 257.

---

Dictionary (6 Ed.Rev.1990) 240. This term refers historically to the Great Wall of China, which served ancient Chinese emperors as a barrier to invasion. Wolfram, Modern Legal Ethics (1986), Section 7.64. Ironically, however, the Great Wall of China was of limited military value. The concept is also referred to in cases and commentary as "screening devices," "ethical screens," or "institutional mechanisms for screening."

7. Kala relies on *Ussury v. St. Joseph's Hosp.* (1988), 43 Ohio App.3d 48, 539 N.E.2d 700. However, *Ussury* impliedly sanctioned screening devices by finding that the new firm had failed to prove the existence of screens to protect confidential information.

{¶ 34} Some courts have held that unrebutted affidavits attesting to a Chinese wall are sufficient to prevent disqualification. However, we reject such a bright-line test, as the court should maintain discretion to weigh issues of credibility. The court should be free to assess the reputation of an attorney and law firm for integrity and honesty. The court should also be free to balance the appearance of impropriety against the protections of a Chinese wall. For example, suppose a sole practitioner representing a plaintiff switches sides to a five-person defense firm representing the opposing party, leaving his former client to seek new counsel. The appearance of impropriety in such a fact pattern may be impossible to overcome.

{¶ 35} If applied properly, screening mechanisms to insulate a quarantined attorney from the rest of the firm can protect client confidences while allowing for attorney mobility and the right of a client to choose counsel.

## VI. ADDITIONAL FACTORS TO CONSIDER IN MOTIONS TO DISQUALIFY

{¶ 36} In addition to the screening devices, there are other important factors to be considered by the trial court. First, the screening devices must be employed as soon as the disqualifying event occurs. See *LaSalle,* 703 F.2d at 259; *Cromley*, 17 F.3d at 1065. Very few cases address how early the disqualifying event occurs. In the *Manning* case, a conflict arose with the attorney's former firm only after the attorney, with the former client's knowledge, had moved to an uninvolved law firm. In *Cromley,* the attorney and the new firm agreed that " 'absolutely nothing of a substantive nature regarding the instant lawsuit would occur' until decisions were made and the clients were made aware of them." *Cromley*, 17 F.3d at 1066. Other cases reviewed have been silent as to the issue of when screening procedures were timely employed, although all cases agree that the screens must be in place when the attorney joins the firm. Instituting screens after a motion to disqualify is too late. *LaSalle*, 703 F.2d at 259 (screens instituted only at time of motion to

disqualify were too late despite attorney's affidavit that he had shared no information with new firm). Accordingly, a court must weigh the timeliness of the screening devices.

{¶ 37} A second factor to consider is the hardship that a client would incur in obtaining new counsel if a motion to disqualify is granted. Hardship may be more of an issue if a conflict arose after a transfer. However, hardship may not carry much weight in a "side-switching" case. Ironically, where an attorney switches sides and joins an opposing counsel's firm, the attorney has de facto deprived his or her first client of the attorney of that client's choice, namely himself or herself. If the attorney has been lead counsel, other counsel in the firm must spend time and effort to take over the lead. If no one remaining in the prior firm is able to handle the matter, or if the attorney was a sole practitioner, the former client must seek out new counsel and incur the burden and expense created by the switch. In this scenario, the departing attorney has created a competing hardship for his or her former client, and the claim by the new firm of hardship created by its own doing in accepting the new attorney into the firm may no longer be persuasive. These are matters that should be left to the trier of fact to weigh.

{¶ 38} In addition, a law firm contemplating hiring counsel who had been directly involved on the opposing side also has a duty to disclose to its own client that such a hiring may place the firm in conflict and could result in disqualification.[8] The law firm may have to subordinate its desire to augment its staff against its duties to its client and avoid placing the firm's interests above the client's interests.

{¶ 39} Finally, the court should hold an evidentiary hearing on a motion to disqualify and must issue findings of fact if requested based on the evidence

---

8. Even though there is no Disciplinary Rule on point, several rules can provide guidance on one's duty to one's own client before hiring opposing counsel who may bring a conflict of interest problem into the attorney-client relationship. See DR 2-110(A)(2), DR 5-101(A), DR 5-105(D), EC 5-2, and DR 7-101(A)(2) and (3). However, the American Bar Association Model Rules of Professional Conduct do address the issue. See Rule 1.9 (Conflict of Interest: Former Client).

presented. Because a request for disqualification implies a charge of unethical conduct, the challenged firm must be given an opportunity to defend not only its relationship with the client, but also its good name, reputation and ethical standards. In *Analytica*, the Court of Appeals for the Seventh Circuit summarized the situation as follows:

"[A]n attorney's and/or a law firm's most valuable asset is their professional reputation for competence, and above all honesty and integrity, which should not be jeopardized in a summary type of disqualification proceeding of this nature. As court proceedings are matters of public record, a news media report concerning a summary disqualification order, based on a scant record of this type, can do irreparable harm to an attorney's or law firm's professional reputation. We must recognize that the great majority of lawyers, as officers of the court, do conduct themselves well within the bounds of the Code of Professional Responsibility." *Analytica*, 708 F.2d at 1275.

## VII.    THE REBUTTABLE-PRESUMPTION TEST
## FOR MOTIONS TO DISQUALIFY

{¶ 40} In conclusion, we hold that in ruling on a motion for disqualification of either an individual (primary disqualification) or the entire firm (imputed disqualification) when an attorney has left a law firm and joined a firm representing the opposing party, a court must hold an evidentiary hearing and issue findings of fact using a three-part analysis:

(1)    Is there a substantial relationship between the matter at issue and the matter of the former firm's prior representation;

(2)    If there is a substantial relationship between these matters, is the presumption of shared confidences within the former firm rebutted by evidence that the attorney had no personal contact with or knowledge of the related matter; and

(3)    If the attorney did have personal contact with or knowledge of the related matter, did the new law firm erect adequate and timely screens to rebut a

presumption of shared confidences with the new firm so as to avoid imputed disqualification?

## VIII. APPLICATION OF TEST TO THIS CASE

{¶ 41} Under the facts of this case, Pearson clearly met the substantial-relationship test and possessed client confidences, as he was the lead attorney on Kala's lawsuit. Thus, the first two parts of the test require disqualification of Pearson and raise a presumption in favor of disqualification of Duvin. No one disputes that Pearson, himself, cannot work further on the case.

{¶ 42} Therefore, we must determine whether the entire firm should be disqualified under the third part of the analysis, imputed disqualification. The appellate court took evidence in the form of affidavits but denied the parties oral argument. The appellate order consisted of the following findings:

"Motion by appellant to disqualify counsel for defendants/appellees is granted. Appellee's new counsel shall file a notice of appearance on or before May 31, 1996."

{¶ 43} Therefore, we must examine the record we have before us, which consists of exhibits and affidavits filed while the parties were briefing the disqualification question in the court of appeals.

{¶ 44} Kala retained Pearson and the Spangenberg firm in 1993 as his attorneys. From 1993 through 1995, Kala trusted Pearson, relied upon him as his attorney, and disclosed all matters pertaining to his case involving his former employer, Aluminum Smelting. Pearson proceeded to file an appeal after the directed verdict and apparently even participated in a settlement conference with the Eighth District Court of Appeals on November 13, 1995. On January 8, 1996, Pearson obtained a continuance to file Kala's appellate brief. On January 22, 1996, Pearson left the Spangenberg firm and joined the Duvin firm, which was representing Aluminum Smelting and had been throughout the prior proceedings with Kala. The only conclusion that can be reached from the record is that Pearson

was negotiating with Duvin while still actively representing Kala without disclosing to Kala his negotiations.

**{¶ 45}** The appearance of impropriety is so strong that nothing that the Duvin firm could have done would have had any effect on Kala's perception that his personal attorney had abandoned him with all of his shared confidences and joined the firm representing his adversary while the case was still pending. No steps of any kind could possibly replace the trust and confidence that Kala had in his attorney or in the legal system if such representation is permitted. This is the classic "side-switching attorney" case.

**{¶ 46}** We find that under this set of egregious facts, the appearance of impropriety was so great that the attempts made by Duvin to erect a Chinese wall were insufficient to overcome the appearance of impropriety. Accordingly, we affirm the disqualification ruling of the court of appeals.

*Judgment affirmed.*

MOYER, C.J., RESNICK and PFEIFER, JJ., concur.

COOK, J., concurs in the syllabus and judgment.

F.E. SWEENEY, J., concurs in judgment only.

DOUGLAS, J., dissents.

—————————————

**DOUGLAS, J., dissenting.**

**{¶ 47}** I respectfully dissent. It appears to me that the majority is saying that under *some* circumstances the creation of a "Chinese wall," no matter how effective, cannot be enough to overcome the presumption of disqualification of an attorney or a firm of attorneys under fact patterns such as those set out in the case now before us. I do not believe that is the law, nor should it be. Moreover, the result is patently unfair. To say now that a firm of attorneys who have represented a major client over a number of years can no longer represent that client is as unfair as the alleged unfairness the majority seeks to rectify.

{¶ 48} Accordingly, I dissent.

———————————