INTRODUCTION {¶ 1} Skycasters LLC hired J. W. Didado Electric Inc. to provide power to its new satellite dish. It also hired Didado to install two generators and two uninterrupted power supplies to provide its computers and the satellite dish with backup power. When Didado failed to complete the project in the time Skycasters thought was required under their contract, Skycasters refused to let it complete the project and sued for breach. Didado counterclaimed, seeking to recover for additional work it had performed for Skycasters outside the written contract. A jury found in favor of Didado, awarding it $66,384.70 in damages. This Court affirms because the jury's verdict was not against the manifest weight of the evidence, and because Skycasters failed to establish that Didado's attorneys should have been disqualified. *Page 2 
 FACTS {¶ 2} Skycasters is an internet service provider that provides internet access to its customers via satellite. At first, it did not own its own satellite dish, but rented space on a dish from a company in New Jersey. In the spring of 2005, it decided to buy its own satellite dish. Because its rental contract renewed on a year-to-year basis, Skycasters had to have its dish operational by July 1, 2005, to avoid having to renew its lease for another full year. Skycasters purchased the dish from Vertex RSI, which also connected all of the communications cables that were necessary to operate the dish to Skycasters' computer system. Vertex did not connect the dish to Skycasters' electrical system.
 {¶ 3} On May 20, 2005, Skycasters entered into a contract with Didado to bring power to the dish. The contract provided that Didado would purchase and install a 35 KW natural gas generator, an 80 KW diesel generator, a 12 KW uninterrupted power supply, and a 60 KW uninterrupted power supply. An uninterrupted power supply is a set of batteries that provides immediate backup power during a power outage until a generator can turn on. The natural gas generator and smaller uninterrupted power supply were to provide backup power for Skycasters' computers. The diesel generator and larger uninterrupted power supply were to provide backup power for the dish. The contract also provided that Didado would supply and install all the conduits and wiring that needed to be run from Skycasters' building out to the satellite dish. Didado promised "to be substantially completed on or before June 21, 2005. Project will be completed with exception of Generator and UPS for Dish."
 {¶ 4} In order to run electrical conduits out to the dish, Didado had to dig a trench across Skycasters' property. It also had to install conduits through part of Skycasters' building. Although the contract was only for one satellite dish, Skycasters anticipated buying additional *Page 3 
dishes in the near future. It, therefore, requested that Didado install enough conduits to supply power for up to three satellite dishes. By having Didado install additional conduits at the same time it installed the conduits for the first satellite dish, Skycasters could prevent future disruptions to its employee work areas and avoid having to dig additional trenches across its property. Skycasters agreed to pay extra for the additional work.
 {¶ 5} Because of the additional work, Didado could not install all of the conduits and wiring by June 21, 2005. It requested a ten day extension, which Skycasters granted. Didado also encountered a problem when it tried to hookup the natural gas generator. According to Skycasters' natural gas company, the building's gas line did not have enough pressure to run the generator. Didado did install the uninterrupted power supply for the computer system and did provide power for the satellite dish by July 1, 2005.
 {¶ 6} According to Skycasters, although the satellite dish had power by the deadline, it was not safe to operate the dish without a working backup system. It claimed that operating the dish without backup power available voided its warranty. Skycasters knew that Didado had ordered a diesel generator that was not scheduled to ship until August 5, 2005. It believed, however, that Didado could have hooked up the satellite dish's uninterrupted power supply so that it could at least have obtained the protection of the power supply's batteries until the generator arrived.
 {¶ 7} According to Didado, it did not install the uninterrupted power supply for the satellite dish because the engineering plans it was following for the project required it to wait until a transfer switch arrived to install it. The transfer switch was being shipped with the diesel generator. Throughout July 2005, the unassembled parts for the satellite dish's uninterrupted power supply were in Skycasters' employee kitchen. Skycasters' owner became upset that, even *Page 4 
though his satellite dish was at risk, Didado's employees did not seem to be doing much work. At the end of the month, Skycasters kicked Didado off the project. When the diesel generator arrived a few days later, Skycasters refused to accept it. Skycasters subsequently hired a different electrical contractor to purchase and install a diesel generator and uninterrupted power supply for the satellite dish.
 {¶ 8} On August 9, 2005, Skycasters sued Didado for breach of contract. Didado filed a counterclaim, seeking payment for its additional work. Before trial, Skycasters moved to disqualify Didado's attorneys because they had helped an agent for Skycasters obtain a zoning variance to allow it to install the satellite dish. The trial court denied the motion. At trial, a jury found for Didado and awarded it $66,384.70 in damages. Skycasters has appealed, assigning two errors.
 MANIFEST WEIGHT {¶ 9} Skycasters' first assignment of error is that the jury's verdict was against the manifest weight of the evidence. In State v.Wilson, 113 Ohio St. 3d 382, 2007-Ohio-2202, at ¶ 26, the Ohio Supreme Court held that the test for whether a judgment is against the weight of the evidence in civil cases is different from the test applicable in criminal cases. According to the Supreme Court in Wilson, the standard applicable in civil cases "was explained in C.E. Morris Co. v. FoleyConstr. Co., 54 Ohio St.2d 279." Id. at ¶ 24. The "explanation" inC.E. Morris was that "[j ]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." Id. (quoting C.E. Morris Co., 54 Ohio St. 2d at 279); but see Huntington Nat'l Bank v. Chappell, 9th Dist. No. 06CA008979, 2007-Ohio-4344, at ¶¶ 17-75 *Page 5 
(Dickinson, J., concurring). This Court, therefore, must affirm if the jury's verdict "is supported by some competent, credible evidence."Wilson, 2007-Ohio-2202, at ¶ 32.
 {¶ 10} "[T]o prove a breach of contract claim a plaintiff must demonstrate by a preponderance of the evidence that: (1) a contract existed, (2) the plaintiff fulfilled his obligations, (3) the defendant failed to fulfill his obligations, and (4) damages resulted from this failure." Second Calvary Church of God in Christ v. Chomet, 9th Dist. No. 07CA009186, 2008-Ohio-1463, at ¶ 9 (citing Lawrence v. Lorain CountyCmty. Coll., 127 Ohio App. 3d 546, 548-49 (1998)). The parties have agreed that a contract existed. The question is whether Didado failed to fulfill its obligations.
 {¶ 11} Skycasters has argued that, although time was of the essence, Didado failed to substantially complete its work by the contract's extended deadline. In the contract, Didado promised to have all of its work done by the deadline except for its installation of the uninterrupted power supply and the generator for the satellite dish. Skycasters has noted that, at the deadline, the natural gas generator for the computer system also was not operating and live wires remained exposed in its parking lot.
 {¶ 12} Didado's president testified about why the natural gas generator was not operating by July 1, 2005. He said that Skycasters' building had a large gas line that his company thought it would be able to tap into to power the natural gas generator. When it tapped into the gas line, however, it discovered that the pressure was insufficient. He testified that the problem was at the street, not at Skycasters' building. He also testified that the problem was something that Didado only could have discovered sooner if it had shut the entire building down. While he acknowledged that he "probably should have known" about the problem, he explained that his company did not have time to check the gas pressure before it tried to hookup the natural gas *Page 6 
generator because the project was "accumulating too fast." He testified that the natural gas company told him that it could provide Skycasters' building with high powered gas service for a couple thousand dollars. Didado discussed the situation with Skycasters, but did not receive an answer about what to do. It, therefore, was unable to finish installing the natural gas generator.
 {¶ 13} Skycasters has also argued that, even though the uninterrupted power supply and generator for the satellite dish were not subject to the contract's deadline, Didado failed to install them within a reasonable time. It has noted that Didado did not order the generator until three weeks after it entered the contract. It has reasoned that, if Didado had ordered the generator sooner, it would have arrived sooner.
 {¶ 14} Didado's president testified that, before he entered into the contract with Skycasters, he presented it with three quotations for diesel generators. One was for nearly double the price of each of the other two, so the parties rejected it. The other two were similar in price, but one had a delivery date that was later than the other. Although the parties agreed to order the one that had the earlier delivery date, Didado informed Skycasters that the supplier would not ship it until August 5, 2005.
 {¶ 15} Didado's president testified that Skycasters knew that the shipping date for the generator was August 5, 2005. Didado stayed in regular contact with the generator company about the shipping date, and, at one point, thought the generator might ship sooner than expected. When the generator company tested the generator, however, it discovered that it had a broken part that needed to be replaced before it could be shipped. Didado's president testified that the generator still shipped by August 5, 2005.
 {¶ 16} The jury's verdict was not against the manifest weight of the evidence. Although Didado did not have the natural gas generator operating by July 1, 2005, it offered competent, *Page 7 
credible evidence that Skycasters could have avoided the problem by letting Didado arrange to have the natural gas company install a new gas line. See Chicago Title Ins. Co. v. Huntington Nat'l Bank,87 Ohio St. 3d 270, 276 (1999) ("The general rule is that an injured party has a duty to mitigate and may not recover for damages that could reasonably have been avoided."). In addition, Skycasters did not establish that Didado failed to install the generator or uninterrupted power supply for the dish within a reasonable amount of time. There was competent, credible evidence that Skycasters knew from the time it entered the contract that the diesel generator would not ship until August 5, 2005. Regarding the dish's uninterrupted power supply, it was undisputed that the project's plans required Didado to wait for a transfer switch to arrive before it could install the power supply. It was also undisputed that the transfer switch was being shipped with the diesel generator. Skycasters' first assignment of error is overruled.
 ATTORNEY DISQUALIFICATION {¶ 17} Skycasters' second assignment of error is that the trial court incorrectly denied its motion to disqualify Didado's attorneys. It has argued that Didado's attorneys had a conflict of interest because they represented a company named V-Static in acquiring a zoning change for Skycasters' property so that it could install the satellite dish. It has argued that V-Static is a subsidiary of Skycasters and that the attorneys' work on the zoning matter allowed them to learn a great deal about Skycasters' business and the property where Didado performed its electrical work.
 {¶ 18} "An attorney may not represent an interest which is adverse to that of a former client when a substantial relationship exists between the subject matter of the former representation and the matter encompassed by the present representation." Friedman v. Kalail, 9th Dist. No. 20657, 2002 WL 498172 at *1 (Apr. 3, 2002) (citingPhillips v. Haidet, *Page 8 119 Ohio App. 3d 322, 325-26 (1997)). "The prerequisite to disqualifying an attorney due to a conflict of interest is the existence of a prior or current attorney-client relationship between the party moving for disqualification and the attorney being sought for disqualification."Witschey v. Medina County Bd. of Comm'rs, 169 Ohio App. 3d 214,2006-Ohio-5135, at ¶ 32 (citing Morgan v. N. Coast Cable Co.,63 Ohio St. 3d 156, 159 (1992)).
 {¶ 19} Didado submitted the deposition of V-Static's president, who testified that V-Static is a limited liability company that installs satellite dishes. He testified that V-Static is a separate company from Skycasters and that he is the only member. Although Skycasters' owner used to be a member of V-Static, that was "six years ago." He testified that Skycasters' owner is not a manager, officer, or director of V-Static and does not exercise any control over it.
 {¶ 20} Skycasters' owner testified at his deposition that V-Static installs, maintains, and services satellite terminal equipment. Because of V-Static's expertise, Skycasters retained it to facilitate the zoning change for its property and the installation of its dish. "At one time, a portion of [V-Static] [had] the same ownership [as Skycasters]." Skycasters' owner testified that he no longer had an interest in V-Static and that he had sold his interest to V-Static's president. He agreed that Skycasters and V-Static had an "arm's-length relationship."
 {¶ 21} "[Disqualification is a drastic measure which should only be imposed if it is absolutely necessary." Friedman, 2002 WL 498172 at *1 (citing Kala v. Aluminum Smelting Refining Co. Inc., 81 Ohio St. 3d 1,6 (1998)). "[T]he moving party must provide some evidence that a need for the disqualification exists. A mere allegation that allowing the representation presents the possibility of a breach of confidence or the appearance of impropriety is not enough." Id. (quotingPhillips, 119 Ohio App. 3d at 327). *Page 9 
 {¶ 22} The trial court correctly determined that Didado's attorneys should not be disqualified. Although the attorney assisted V-Static in obtaining a zoning change for Skycasters' property, both V-Static's and Skycasters' owners testified that they were independent companies. Although Skycasters' owner used to have an interest in V-Static, he affirmed that his relationship with V-Static was at arms length. Skycasters, therefore, failed to establish that there was a prior attorney-client relationship between it and Didado's attorneys. Skycasters' second assignment of error is overruled.
 CONCLUSION {¶ 23} The jury's verdict in favor of Didado was not against the manifest weight of the evidence. Skycasters failed to establish that Didado's attorneys should have been disqualified for having a conflict of interest. The judgment of the Summit County Common Pleas Court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is *Page 10 
instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30. Costs taxed to appellant.
 SLABY, P. J., WHITMORE, J., CONCUR. *Page 1