DISCIPLINARY COUNSEL *v*. CICERO.

[Cite as *Disciplinary Counsel v. Cicero,* **134 Ohio St.3d 311, 2012-Ohio-5457.**]

*Attorney misconduct, including communicating information received from a prospective client to a third party—One-year suspension.*

(No. 2012-0278—Submitted September 11, 2012—Decided November 28, 2012.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 11-055.

_____

LANZINGER, J.

{¶ 1} Respondent, Christopher T. Cicero of Columbus, Ohio, Attorney Registration No. 0039882, was admitted to the practice of law in Ohio in 1988. On June 13, 2011, relator, disciplinary counsel, filed a complaint with the Board of Commissioners on Grievances and Discipline. The complaint charged Cicero with professional misconduct based on his communicating information that he had received from a prospective client to a third party. Relator alleged that Cicero's conduct violated Prof.Cond.R. 1.18 (prohibiting a lawyer from using or revealing information learned during discussions with a prospective client) and 8.4(h) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law).

{¶ 2} A panel of the Board of Commissioners on Grievances and Discipline heard testimony, reviewed the evidence, and made findings of fact and conclusions of law. The panel concluded that Cicero had violated Prof.Cond.R. 1.18 and 8.4(h) and recommended that this court suspend his license to practice law in Ohio for six months. The board adopted the panel's findings and recommended sanction, and further recommended that the costs of the proceedings be taxed to Cicero.

**{¶ 3}** Cicero filed objections to the board's report. For the reasons that follow, we overrule those objections, accept the board's findings of fact and misconduct, and suspend Cicero from the practice of law in Ohio for one year.

**Misconduct**

*Factual Background*

**{¶ 4}** On April 1, 2010, federal law enforcement officials raided Edward Rife's house and seized $15,000 to $20,000 worth of Ohio State University football memorabilia as part of a drug-trafficking investigation. Rife testified that on April 2, the day after the raid, he and Joseph Epling, a former partner in Rife's tattoo business, met with Cicero to discuss his criminal case. Cicero and Epling testified before the panel and denied that an April 2 meeting occurred, but both testified that Cicero and Epling had a phone conversation on April 1 during which they discussed the raid on Rife's home.

**{¶ 5}** On the afternoon of April 2, Cicero sent an e-mail to Jim Tressel, who was then the head coach of the Ohio State University football team. In the e-mail, Cicero alerted Tressel to a possible association between Rife and team members and provided general information about Rife's background and the raid on Rife's home.

**{¶ 6}** Rife retained Stephen Palmer to represent him in the criminal case, and Palmer discussed a possible plea deal and ten-year prison sentence with Rife. Rife testified that he became unsatisfied with Palmer and scheduled another meeting with Cicero to discuss his case. This meeting took place on April 15. Although Cicero denies giving any legal advice, the panel found that Cicero did express legal opinions during this meeting. First, the panel found that Cicero assured Epling, who was also present at the meeting, that he did not need to hire a lawyer. The panel believes Cicero gave this advice to clear away any potential conflict so he could represent Rife. Second, Cicero admitted that he advised Rife that he could not get the Ohio State memorabilia back if the federal government

2

believed that Rife had purchased it using drug money. This was advice that the panel considered to be of a legal nature and within the particular expertise of a criminal-law attorney. Third, Cicero testified that he told Rife that a person in Rife's situation faces two choices: "You either can sit in the county jail for a long period of time, or you can start cooperating with the federal government and become a snitch." Rife testified that although he never specifically asked for the information he gave at the April 15 meeting to be kept confidential, he assumed that it would be. He never gave Cicero permission to reveal to Tressel any information discussed. The panel found that Cicero should have treated the information from Rife as confidential, but instead, he planned to forward the information he learned to Tressel, and he did not disclose to Rife this intent.

{¶ 7} On the morning of April 16, Cicero sent a second e-mail to Tressel. As the e-mail reveals, Cicero revealed specifics of Rife's case that he had learned the previous day:

- I had Eddie Rife in my office for an hour and a half last night.

- *What I tell you is confidential.*

- He told me [a former player] gave him some type of MVP trophy—but I dont [sic] know the year.

- He told me he has about 15 pairs of cleats (with signatures), 4-5 jerseys—all signed by players, the 2009 Wisconsin game ball (whoever that was awarded to).

- He told me he has about 9 rings Big Ten Championship * * *.

* * *

- He will not talk publicly about this.

- *If he retains me, and he may,* I will try to get these items back that the government now wants to keep for themselves * * *.

* * *

- Just passing this info on…especially now that I actually talked to Mr. Rife.

(Emphases added.)  Later that day, Cicero sent another e-mail to Tressel in which he disclosed further information about Rife:

- He is in really big trouble.  The federal government has told him that his best offer is to take 10 years in prison.  *He wanted my opinion yesterday on his situation*.

* * *

- I have to sit tight and wait to see if he retains me, but at least he came in last night to do a face to face with me.
- One correction from my first email to you…he did confirm to me that he put out on the street the government took 70,000 from his house, but he made that up so other associates of his would think it; so they wouldnt [sic] do a home invasion on him and his family.  But, he had that much cash just lying around.

* * *

- Take care.  I will keep you posted as relevant information becomes available to me.  *Just keep our emails confidential.* Thank you.

(Emphases added.)  Cicero testified that he did not intend to tell Tressel that Rife might retain him and that he was not referring to Rife when he said, "If he retains

4

me, and he may," but Cicero did admit that the e-mails are written in a way that the only person Cicero could be referring to is Rife.

*Legal Analysis*

**{¶ 8}** Prof.Cond.R. 1.18 sets forth a lawyer's duties to a prospective client. It provides:

> (a) A person who discusses with a lawyer the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client.

> (b) Even when no client-lawyer relationship ensues, a lawyer who has had discussions with a prospective client shall not use or reveal information learned in the consultation, except as Rule 1.9 would permit with respect to information of a former client.

**{¶ 9}** We agree with the board that relator has proved by clear and convincing evidence that Rife was a prospective client of Cicero. As the panel found, the two discussed the possibility of a client-lawyer relationship; Cicero admitted this in his e-mails to Tressel, and Rife testified as to the discussion. Rife's testimony was corroborated by Palmer, who testified that Rife had told him soon after the meeting with Cicero that Cicero had quoted him a fee. Rife met with Cicero on April 15 to discuss his case, and Cicero offered legal advice in response to Rife's questions.

**{¶ 10}** Cicero argues that Epling's presence during the April 15 meeting indicates that Epling, rather than Rife, was his client. We find this argument unpersuasive. While Prof.Cond.R. 2.3 does permit a lawyer to provide an evaluation of a matter affecting a client for the use of a third party, the record is clear that Epling was not a client of Cicero during the events in question. Epling

testified that Cicero told him he did not need a lawyer for representation in relation to the raid on Rife's home. Epling stated, "I knew I didn't need a lawyer because I wasn't involved." Furthermore, Cicero's e-mails to Tressel clearly indicate that Cicero believed that Rife was a prospective client.

{¶ 11} Because relator has established that Rife was a prospective client of Cicero, we must next consider whether Cicero improperly revealed information learned during his consultation with Rife. Prof.Cond.R. 1.18(b) states that information that an attorney receives from a prospective client should not be revealed, except as permitted under Prof.Cond.R. 1.9(c), which states:

> A lawyer who has formerly represented a client in a matter * * * shall not thereafter do either of the following:
>
> (1) use information relating to the representation to the disadvantage of the former client except as these rules would permit or require with respect to a client or when the information has become generally known;
>
> (2) reveal information relating to the representation except as these rules would permit or require with respect to a client.

{¶ 12} In his objections to the board's report, Cicero argues that the information he communicated to Tressel was "generally known" and that the communication was therefore permitted by Prof.Cond.R. 1.9(c)(1). A close examination of the April 16 e-mails, however, reveals that Cicero disclosed not only generally known information—for example, that Rife's home had been raided by federal agents—but also a number of specific details about Rife's case that Cicero could only have learned during his consultation with Rife. This information does not fall into the "generally known" exception of Prof.Cond.R.

1.9(c)(1).  Cicero violated Prof.Cond.R. 1.18(b) when he disclosed to Tressel confidential information about Rife's case learned during the April 15 meeting.

**{¶ 13}** We note that this is the first case in which we have had the occasion to determine whether an attorney violated Prof.Cond.R. 1.18 by revealing the confidences of a prospective client.  We also recognize that the Official Comments to the rule indicate that the protection afforded by the rule is limited in scope:

[1] Prospective clients, like clients, may disclose information to a lawyer, place documents or other property in the lawyer's custody, or rely on the lawyer's advice.  A lawyer's discussions with a prospective client usually are limited in time and depth and leave both the prospective client and the lawyer free (and sometimes required) to proceed no further.  Hence, prospective clients should receive some but not all of the protection afforded clients.

[2] Not all persons who communicate information to a lawyer are entitled to protection under this rule.  A person who communicates information unilaterally to a lawyer, without any reasonable expectation that the lawyer is willing to discuss the possibility of forming a client-lawyer relationship, is not a "prospective client" within the meaning of division (a).

While we recognize that some limitations on the rule's protection to prospective clients may be justified, those limitations do not come into play here.  Indeed, this case goes to the very heart of confidentiality between a prospective client and an attorney.  Before obtaining representation, clients must meet with attorneys, and attorneys often must obtain sensitive information before they can decide whether

to represent a client. Prospective clients trust that their confidences will be protected when they engage in an initial consultation with an attorney. Cicero's almost immediate dissemination of the detailed information that Rife provided on April 15 directly violated that trust. This conduct violates Prof.Cond.R. 1.18, as well as Prof.Cond.R. 8.4(h), which prohibits a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law.

{¶ 14} Cicero argues that the evidence on the record does not clearly and convincingly prove the violations found by the board. He asserts that Rife was an unreliable witness and that the panel did not explain why it accepted Rife's testimony over his own. Cicero's argument is unavailing. "Unless the record weighs heavily against a hearing panel's findings, we defer to the panel's credibility determinations, inasmuch as the panel members saw and heard the witnesses firsthand." *Cuyahoga Cty. Bar Assn. v. Wise*, 108 Ohio St.3d 164, 2006-Ohio-550, 842 N.E.2d 35, ¶ 24, citing *Cincinnati Bar Assn. v. Statzer*, 101 Ohio St.3d 14, 2003-Ohio-6649, 800 N.E.2d 1117, ¶ 8. The panel did explain why it chose not to believe Cicero's testimony, stating, "Respondent's testimony at the hearing was at times disingenuous and not credible." Furthermore, Cicero's own testimony and the e-mails he sent to Tressel form a sufficient basis for a finding that he violated Prof.Cond.R. 1.18(b).

{¶ 15} We therefore hold that relator has proved by clear and convincing evidence that Cicero violated Prof.Cond.R. 1.18 and 8.4(h).

### Sanction

{¶ 16} When imposing sanctions for attorney misconduct, we consider relevant factors, including the ethical duties that the lawyer violated and the sanctions imposed in similar cases. *Stark Cty. Bar Assn. v. Buttacavoli*, 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16. We also weigh evidence of the aggravating and mitigating factors listed in BCGD Proc.Reg. 10(B). *Disciplinary Counsel v. Broeren,* 115 Ohio St.3d 473, 2007-Ohio-5251, 875

N.E.2d 935, ¶ 21. Because each disciplinary case is unique, we are not limited to the factors specified in the rule but may take into account "all relevant factors" in determining what sanction to impose. BCGD Proc.Reg. 10(B).

{¶ 17} The board found as a mitigating factor that Cicero has an excellent reputation among judges and attorneys for professional integrity and competence. But the board found five aggravating factors. First, Cicero has a prior disciplinary offense for which he was suspended from the practice of law in Ohio for one year. *See Disciplinary Counsel v. Cicero*, 78 Ohio St.3d 351, 678 N.E.2d 517 (1997). Second, the board concluded that Cicero acted with a selfish motive, because his reason for disclosing to Tressel his possible attorney-client relationship with Rife was self-aggrandizement. Third, the board stated that Cicero's "testimony at the hearing was at times disingenuous and not credible." Fourth, the board stated that Cicero refused to acknowledge the wrongful nature of his misconduct. Fifth, the board concluded that the disclosure of the information about the Ohio State memorabilia caused Rife and his family to be subjected to criticism and harassment by the news media and others for causing harm to the Ohio State football program.

{¶ 18} Cicero argues that only his prior disciplinary record should qualify as an aggravating factor. Recognizing that the panel was in the best position to evaluate the demeanor and credibility of the witnesses, we accept its findings in regard to the additional four aggravating factors and consider them in our determination of the appropriate sanction.

{¶ 19} As noted above, we have not yet addressed a case in which an attorney has violated Prof.Cond.R. 1.18. Cicero argues for a six-month stayed suspension, citing *Disciplinary Counsel v. Yurich*, 78 Ohio St.3d 315, 677 N.E.2d 1190 (1997); *Disciplinary Counsel v. Shaver*, 121 Ohio St.3d 393, 2009-Ohio-1385, 904 N.E.2d 883; *Geauga Cty. Bar Assn. v. Psenicka*, 62 Ohio St.3d 35, 577 N.E.2d 1074 (1991); and *Columbus Bar Assn. v. Boggs*, 39 Ohio St.3d 601, 529

N.E.2d 936 (1988). Relator correctly points out, however, that none of these cases involved any aggravating factors. And in the other case cited by Cicero, *Disciplinary Counsel v. Kimmins*, 123 Ohio St.3d 207, 2009-Ohio-4943, 915 N.E.2d 330, ¶ 18, in which the respondent received a one-year stayed suspension, we found fewer aggravating factors and more mitigating factors and explicitly noted that there was an absence of a dishonest or selfish motive.

{¶ 20} Relator cites *Columbus Bar Assn. v. Dye*, 82 Ohio St.3d 64, 694 N.E.2d 440 (1998), in which we imposed a two-year suspension. *Dye*, however, involved more than disclosure of confidential client information. The violations in *Dye* included collecting an illegal or clearly excessive fee, accepting and continuing representation of a client when the attorney's independent professional judgment regarding another client would be adversely affected, and failing to return the remainder of a fee. *Id.* at 66-67. Clearly, the violations in *Dye* were more numerous than in the present case.

{¶ 21} Because the facts of this case fall between those in the cases cited by Cicero and those cited by relator, we hold that a one-year suspension is proper. This sanction comports with the severity of Cicero's violations and takes into account both the mitigating and aggravating factors. Cicero is hereby suspended from the practice of law in Ohio for one year. Costs are taxed to Cicero.

Judgment accordingly.

O'CONNOR, C.J., and PFEIFER, CUPP, and MCGEE BROWN, JJ., concur.

LUNDBERG STRATTON and O'DONNELL, JJ., dissent.

_____

**LUNDBERG STRATTON, J., dissenting.**

{¶ 22} I dissent only because I disagree with the sanction. While I agree with the finding of violations, I would impose a six-month suspension, all stayed upon conditions. I believe that Cicero's intentions were not for personal aggrandizement or personal gain, as found by the majority, but were to alert the

coach about misconduct by his players that could affect the team. His request that such information be held confidential does not support the notion that he was trying to seek fame. That conclusion is contrary to the content of the e-mails. Therefore, I respectfully dissent.

O'DONNELL, J., concurs in the foregoing opinion.

_____

Jonathan E. Coughlan, Disciplinary Counsel, and Joseph M. Caligiuri, Senior Assistant Disciplinary Counsel, for relator.

The Behal Law Group, L.L.C., and John M. Gonzales, for respondent.

_____