**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Disciplinary Counsel v. Ward,* **Slip Opinion No. 2015-Ohio-237.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2015-OHIO-237

DISCIPLINARY COUNSEL *v.* WARD.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Ward,* Slip Opinion No. 2015-Ohio-237.]**

*Attorneys—Misconduct—Conflict of interest—Using confidences of client for benefit of others to client's detriment—Commingling—One-year suspension.*

(No. 2013-1979—Submitted February 26, 2014—Decided January 29, 2015.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 2012-026.

_____

**Per Curiam**.

{¶ 1}  Respondent, Richard Grove Ward of Cincinnati, Ohio, Attorney Registration No. 0037613, was admitted to the practice of law in Ohio in 1986. Relator, disciplinary counsel, charged Ward with violating the Disciplinary Rules of the former Code of Professional Conduct by accepting employment from a client whose interests were substantially related to and directly adverse to those of a long-term client of his law firm, using the confidences and secrets of his firm's

long-term client for the benefit of others and to that client's detriment, and placing funds belonging to a second client in his personal investment account.

{¶ 2}   After hearing the case, a panel of the Board of Commissioners on Grievances and Discipline[1] recommended that Ward be suspended from the practice of law for one year based on findings that he (1) accepted employment in which his exercise of professional judgment on behalf of the client was affected by his own interests, (2) used a client's confidences or secrets to the client's disadvantage, (3) engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation, and (4) failed to hold a client's property separate from his own property.  The panel found that this misconduct adversely reflected on Ward's fitness to practice law.  The panel also recommended that six other alleged violations be dismissed due to the insufficiency of the evidence.

{¶ 3}   The board adopted the panel's report in its entirety, and neither party has filed objections.  We adopt the board's findings of fact and misconduct, but instead of dismissing six of the alleged violations as recommended by the board, we dismiss only five.  Consistent with the board's recommendation, we find that a one-year suspension is the appropriate sanction for Ward's misconduct.

## Misconduct

### Count I:  Koons Confidences and Conflict of Interest

{¶ 4}   Count I of relator's complaint alleges that Ward has engaged in professional misconduct while working at the law firm Drew & Ward Co., L.P.A., with his father, Richard Hackney Ward ("Dick Ward"), by taking on the representation of a client whose interests were in direct conflict with those of his father's long-term client, John F. Koons III ("Bud Koons").  The alleged misconduct falls into three distinct categories: (1) the improper disclosure or use of confidential client information, (2) the acceptance of employment that will or is

---

[1] Effective January 2, 2015, the Board of Commissioners on Grievances and Discipline has been renamed the Board of Professional Conduct.  *See* Gov.Bar R. (V)(1)(A), 140 Ohio St.3d CII.

likely to adversely affect the exercise of the lawyer's independent professional judgment on behalf of a client, and (3) general misconduct involving dishonesty, fraud, deceit, or misrepresentation and conduct that is prejudicial to the administration of justice. Before addressing the alleged violations, however, it is necessary to understand both the numerous relationships at issue and the timeline of the relevant events.

*The Underlying Koons Representation and its Relationship to*

*the Cundall Representation*

**{¶ 5}** Bud Koons was the principal owner of Central Investment Corporation ("CIC") which became the seventh largest Pepsi-Cola bottler in the United States, and its successor Central Investment, L.L.C. ("LLC").

**{¶ 6}** Dick Ward had a close personal relationship with Bud Koons that started in high school. From the early 1970s until 2005, he also served as Bud's lawyer, confidant, advisor, and business associate. During this relationship, Dick served on the CIC board of directors and the LLC board of managers. Dick and the Drew & Ward law firm also represented Bud Koons in three divorces and several antenuptial agreements, handled various estate-planning matters, and prepared 25 trusts for him and his family. Dick personally served as trustee for at least 11 of those trusts, which Koons funded with annual gifts of CIC stock. During this time, the law firm of Taft, Stettinius & Hollister, L.L.P., also provided legal services for Koons and the various business entities he controlled. But most of Koons's major business and personal matters were reviewed by a "committee of four" comprised of two partners from the Taft firm and two partners from Drew & Ward—Dick Ward and Bill Graf.

**{¶ 7}** After 26 years at Drew & Ward, 20 of them as a partner, Bill Graf departed the firm in 2004. After Graf's departure, Ward joined the firm as a partner in August 2004. During his first seven months at the firm, Ward assisted his father on some matters involving Bud Koons's personal and business interests.

At that time, CIC was involved in litigation that threatened its Pepsi bottling and distribution business, and the firm's billing records reflect that Ward performed some work related to the Pepsi negotiations.

{¶ 8} In January 2005, CIC agreed to settle the dispute and sell its business to PepsiAmericas, Inc. for approximately $400 million, and LLC was formed to hold the proceeds of that sale. Shortly thereafter, Bud Koons had another attorney request that Dick Ward disentangle himself from Koons's business and personal interests. Consequently, Dick Ward resigned from his position as co-trustee of a major trust (Trust A, described below) on February 18, 2005, and resigned from the board of LLC no later than February 28, 2005. Contemporaneously with these resignations, Koons offered and Dick Ward accepted a consulting agreement with LLC that would pay him $250,000 per annum for five years for his consulting services, plus separate compensation for any legal services that he might provide. The attorney who delivered the news to the Wards testified that Dick Ward "was delighted with the consulting agreement," but that he "perceived hostility and unhappiness" from Ward.

{¶ 9} Bud Koons died on March 3, 2005, while residing in Florida.

{¶ 10} Central to allegations of Ward's ethical misconduct is a trust created by Bud Koons's parents in 1976 for the benefit of their grandchildren. Share A of that trust was designated for the benefit of Bud Koons's family, and Share B was designated for the benefit of the family of his sister, Betty Lou Cundall. Bud's parents designated him as the trustee for the entire trust, the original corpus of which consisted of shares of CIC stock. In 1984, CIC redeemed the CIC stock of Share B for cash, and Bud, in his capacity as trustee, invested the proceeds of the redemption in various stocks, bonds, and cash. None of Share A's CIC stock was redeemed.

{¶ 11} On November 23, 1992, the original trust was divided into two separate trusts. The Share A assets were placed into Trust A for the benefit of the

Koons family, and the Share B assets were placed into Trust B for the benefit of the Cundall family. Following the division, Bud Koons remained as the sole trustee of Trust B. But he resigned as trustee of Trust A and was replaced by three successor trustees designated by the original trust, namely, Dick Ward, attorney James J. Ryan, and Jeff Koons.

{¶ 12} Following Bud Koons's death, Dick Ward asked Ward to review Trust B to determine how it was to be distributed. To complete this task, Ward reviewed files in the possession of Drew & Ward and participated with his father in a telephone call to Harry Badanes, accountant for the trusts, in an effort to determine the value of CIC stock. Badanes had worked with Dick Ward on various issues for Bud Koons, including tax returns and valuing CIC stock. As a result of this review, Ward began to question whether Bud had honored his fiduciary duties to the Cundall beneficiaries while serving as the trustee for Trust B and whether his father might be exposed to liability as a co-trustee of that trust in the event of litigation.

{¶ 13} On March 22, 2005, following Ward's review of Trust B, Dick Ward sent a letter to James J. Ryan, his co-successor trustee, questioning the disparity in values of Trust A and Trust B and Bud Koons's fiduciary duties to the Cundall beneficiaries. That letter stated: "I have, together with my son, Nick, been reviewing the above document under the terms of which Jeff Koons, you and I became Trustees at Bud's death earlier this month. We have an extensive list of questions and what appears to be an extremely sticky wicket to discuss with you before moving along." Although Dick Ward initially acquiesced to his role as a co-successor-trustee of Trust B, in April 2005, he, Ryan, and Jeff Koons executed a document declining to serve as successor trustees.

{¶ 14} Before joining Drew & Ward, Ward was a friend of, and attorney to, Michael Cundall, who was one of Betty Lou Cundall's children, and consequently, a beneficiary of Trust B. In March 2005, Ward approached

5

Michael and his sister to discuss the distribution of Trust B and the appointment of a successor trustee if Dick Ward, James Ryan, and Jeff Koons declined to serve. But Ward also suggested the possibility of a lawsuit arising out of Bud's administration of Trust B. On April 5, 2005, he sent Michael a fee agreement, proposing that he represent Michael in such an action for a contingent fee of 10 percent if the case settled out of court in less than six months, 15 percent if settled out of court in more than six months, 20 percent through court action, and 25 percent through appeals. Later that month, Ward travelled to Florida to meet with Cundall, who agreed to the representation. They modified this agreement several times over the course of their attorney-client relationship, eventually increasing Ward's contingent fee to 50 percent.

{¶ 15} After agreeing to represent Cundall, Ward contacted a local bar association's ethics hotline to discuss whether his father's prior involvement with Bud Koons and his business interests disqualified Ward from representing Cundall and the other beneficiaries of Trust B. Ward testified that as a result of this contact, he concluded that there was no basis for disqualification.

{¶ 16} On August 2, 2005, Ward discussed his representation of Michael Cundall—and the possibility that that representation would create a conflict— with the shareholders and directors of Drew & Ward. One month later, he filed a complaint in the Hamilton County Court of Common Pleas seeking to have Cundall appointed as the successor trustee for Trust B.

{¶ 17} As discussions within the firm continued, the shareholders and directors of Drew & Ward asked Ward to prepare a memorandum regarding any potential conflict issues raised by his representation of Michael Cundall. In a memo, dated November 14, 2005, Ward stated that after conducting extensive research on the issue and applying the conflict analysis this court adopted in *Kala v. Aluminum Smelting & Refining Co., Inc.*, 81 Ohio St.3d 1, 688 N.E.2d 258 (1998), he had reached the conclusion that neither he nor the firm was disqualified

from representing the Trust B beneficiaries in a lawsuit against the estate of Bud Koons for Bud's alleged breach of his fiduciary duties in the administration of Trust B. Having considered this memo, the firm's directors and shareholders authorized Ward to file the lawsuit.

{¶ 18} Acting as a member of Drew & Ward, Ward filed a complaint on behalf of Michael Cundall, individually and as successor trustee of Trust B, in the Hamilton County Court of Common Pleas on March 3, 2006. The complaint alleged that Bud Koons had breached his fiduciary duties as the trustee of Trust B and had unjustly enriched the Koons beneficiaries at the expense of the Cundall beneficiaries by coercing the latter to sell their shares of CIC for less than their true value. The named defendants included the executors of Bud Koons's estate and successor trustees of the related Koons trusts.

{¶ 19} Certain of the defendants moved to disqualify Ward and Drew & Ward on July 27, 2006, but the trial court never ruled on the motion. The court did, however, grant the defendants' motion to dismiss the action on January 5, 2007. The First District Court of Appeals reversed that dismissal with respect to all defendants except U.S. Bank. *Cundall v. U.S. Bank,* 174 Ohio App.3d 421, 2007-Ohio-7067, 882 N.E.2d 481. But finding that the statute of limitations barred all of Cundall's claims, we reversed the judgment of the appellate court and remanded the cause to the trial court for entry of judgment in favor of the defendants. *Cundall v. U.S. Bank*, 122 Ohio St.3d 188, 2009-Ohio-2523, 909 N.E.2d 1244.

{¶ 20} In February 2007, the personal representatives of Bud Koons's estate, various successor trustees, including the successor trustees of Trust A, and LLC sued Drew & Ward, Dick Ward, and Ward for malpractice. Ward and his father immediately agreed to indemnify Drew & Ward and its shareholders against claims advanced in the action and further agreed to take no action that "would clearly void" the firm's malpractice insurance. Ward and Dick Ward left

the firm in March 2009 and formed The Ward Law Firm, L.L.C. They ultimately settled the malpractice claim for $5 million.

*Client Confidences and Secrets*

**{¶ 21}** "A fundamental principle in the attorney-client relationship is that the attorney shall maintain the confidentiality of any information learned during the attorney-client relationship." *Kala*, 81 Ohio St.3d at 4, 688 N.E.2d 258. The purpose of this confidentiality is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981).

**{¶ 22}** In *Kala*, we considered "whether a law firm should be automatically disqualified from representing a party when an attorney leaves his or her former employment with a firm representing a party and joins the law firm representing the opposing party, or whether that law firm may overcome any presumption of shared confidences by instituting effective screening mechanisms." *Id.* at 3. At the outset, we noted:

> When an attorney leaves his or her former employment and becomes employed by a firm representing an opposing party, a presumption arises that the attorney takes with him or her any confidences gained in the former relationship and shares those confidences with the new firm. This is known as the presumption of shared confidences.

*Id.* at 5.

**{¶ 23}** While recognizing that a lawyer's obligation to preserve a client's confidences and secrets under former DR 4-101 survives the termination of the attorney-client relationship, we also recognized that there is a countervailing

public-policy interest in protecting a client's right to choose his or her counsel. *Id.* at 4; *see also* EC 4-6. Disqualification of a party's chosen counsel on the basis that the attorney has "switched sides" interferes with that freedom of choice. *Id.* at 5-6.

{¶ 24} In balancing these competing interests, we adopted a three-part test to determine whether a lawyer can overcome the presumption of shared confidences when the lawyer leaves one firm and joins another firm that represents an opposing party. *Id.* at 13. That test examines (1) whether a substantial relationship exists between the matter at issue and the matter of the former firm's prior representation, (2) if that substantial relationship is found to exist, whether there is sufficient evidence that the attorney had no personal contact with or knowledge of the related matter to overcome the presumption of shared confidences within the former firm, and (3) if the attorney did have personal contact with or knowledge of the related matter, whether institutional screening mechanisms have been adopted by the new firm to prevent the flow of information from the quarantined lawyer to preserve the confidences of the former client and avoid imputed disqualification of the entire firm. *Id.*

{¶ 25} This case does not involve an attorney moving from one law firm to another, but the board concluded that the same presumption of shared confidences should apply when an attorney and his law firm terminate a relationship with an existing client and, thereafter, the attorney (or other attorneys in that law firm) seeks to represent a new client in an action that is directly adverse to the former client. In his memo to his partners, Ward recognized that the *Kala* test was relevant in determining whether he and Drew & Ward had a conflict of interest in accepting the Cundall representation, and he concluded that there was no conflict of interest to prevent him from representing Cundall. The board reached a different conclusion.

**{¶ 26}** Analyzing the facts of this case under *Kala*, the board found that Dick Ward and Drew & Ward had an attorney-client relationship with respect to Bud Koons and his affiliated business and personal interests that ended on approximately February 28, 2005—the date that Dick Ward executed the consulting agreement. During their representation, which started in the early 1970s, Dick Ward and the firm had access to their client's confidences and secrets relating to the initial allocation of assets between Share A and Share B of the original grandparent trust, the asset allocation of Trust A and Trust B, and the value of CIC stock.

**{¶ 27}** Even though the evidence was insufficient to demonstrate that Dick Ward participated directly in the redemption of Share B's CIC stock, the board found that he and his firm clearly had access to confidential documents and information related not only to that transaction, but also to Bud Koons's administration of Trust B. And because Dick Ward wore so many hats with regard to Bud Koons's interrelated personal and business interests—including attorney for CIC and LLC, board member for CIC and LLC, personal attorney for and confidant to Bud Koons, co-trustee of Trust A for more than ten years, trustee of multiple other trusts, and consultant to LLC—the board could not determine in which capacity he gained access to the confidences and secrets at issue. With regard to Dick Ward's involvement, the board found that he (1) gained an understanding of the organization and activities of Bud's business, (2) actively participated in Bud's estate plan, which depressed the value of Bud's stock by reducing his ownership to a minority interest, (3) arranged gifts of shares to CIC and other tax-planning strategies, (4) signed gift-tax returns, and (5) actively participated in the settlement of the Pepsi litigation as a director of CIC and LLC, which provided the source of funds that became the subject matter of the Cundall litigation. Moreover, the board determined that all of these matters were relevant

to the valuation of the shares of these businesses for redemption purposes—which is directly and substantially related to the Cundall litigation.

{¶ 28} Attorney Bill Graf also testified that during his time at Drew & Ward, he was deeply involved in matters related to the valuation of CIC stock, Bud Koons's business interests, and Bud's estate plan. He stated that he and Dick Ward and two partners from the Taft firm were Bud's primary advisers. Although Graf left the firm in May 2004, the client and the records documenting Graf's involvement in the client's affairs remained with the firm. Due to the scope of their involvement, the board found that Dick Ward, Bill Graf, and Drew & Ward shared in Bud Koons's confidences and secrets related to both his personal and business interests.

{¶ 29} Because Drew & Ward represented Koons personally and also represented his trust and business interests, the board determined that Ward is rebuttably presumed to have shared in the confidences and secrets possessed by the firm. Therefore, the board considered the evidence Ward submitted to rebut that presumption. It found no evidence that Drew & Ward had established any institutional screening mechanism to prevent confidential information concerning Bud Koons's personal or business interests from flowing to Ward. And although Ward testified that he did not personally represent Bud Koons, the board found that Ward actually possessed Koons's confidential information.

{¶ 30} For instance, the board noted that following Bud's death, Dick Ward instructed Ward to gather information about Trust B. And in his March 22, 2005 letter to Jim Ryan about the "sticky wicket" they needed to address, Dick Ward stated that he had "been reviewing" Bud Koons's information with Ward. Moreover, in the conflict memo that Ward prepared for his partners, he acknowledged, "A couple of weeks after Bud's death, [Dick Ward] asked me to look at the B trust and figure out what to do to distribute it. That's when I first read it and started finding issues with what had occurred." Not only did Ward

review and analyze Koons's records in Drew & Ward's possession, but he also joined his father in contacting Koons's accountant to seek additional information about the valuation of CIC stock over the years.

{¶ 31} Ward could only have gained the level of detailed information set forth in his conflict memo from his father and the records maintained by the firm. But more importantly, the board found, and we agree, that he actually used the confidential information maintained by Dick Ward, Bill Graf, and Drew & Ward to shape his theories and his pleadings in the Cundall litigation to the disadvantage of Koons in violation of DR 4-101(B)(2) (prohibiting a lawyer from knowingly using the confidence or secret of a client to the client's disadvantage).

{¶ 32} The board recommends, however, that we dismiss two of the alleged violations related to his handling of Bud Koons's confidences and secrets. First, the board suggests that there is no violation of DR 4-101(B)(1) (prohibiting a lawyer from knowingly revealing a confidence or secret of his client) because "[r]elator has failed to establish by clear and convincing evidence that Bud Koons was [Ward's] client * * *." But the board found that Bud Koons was a client of the Drew & Ward firm, that the confidences and secrets the firm acquired during his representation were shared with Ward, and that Ward used those confidences to the disadvantage of client Koons. While we agree that this violation should be dismissed, it is because relator failed to prove by clear and convincing evidence that Ward *disclosed* those confidences and secrets, as there is some evidence that the value of CIC's settlement with Pepsi had already been publicly released.

{¶ 33} Although the board found that Ward *actually used* confidential information maintained by his law firm regarding Koons's personal and business affairs to shape his theories and pleadings in the Cundall litigation, it also recommends that we dismiss an alleged violation of DR 4-101(B)(3) (prohibiting a lawyer from knowingly using a confidence or secret of his client for the advantage of himself or a third person unless the client consents after full

12

disclosure). The board adopted the panel's explanation of this recommendation, which stated as follows:

> Even though the Panel believes that Dick Ward [Ward's father] may have violated DR 4-101(B)(1) by *revealing* [the stock sale price contained in the settlement of the Pepsi litigation] to Respondent, the panel concludes that Relator has failed to prove by clear and convincing evidence that Respondent violated DR 4-101(B)(3) in regards to *disclosure* of that information. Additionally, Relator has failed to prove by clear and convincing evidence that the amount [LLC] received in the Pepsi settlement was not already reasonably available in the public domain before Respondent allegedly *revealed* that information.

(Emphasis added.)

{¶ 34} But DR 4-101(B)(3) does not prohibit a lawyer from *disclosing* client confidences or secrets; it prohibits a lawyer from *using* a client's confidence or secret for the advantage of the lawyer or a third party without the client's consent. Here, the evidence shows that Ward knowingly used confidential information that Drew & Ward obtained during its representation of Koons's various interests to solicit and secure Cundall as a client and to formulate his legal strategy in the resulting litigation without Koons's consent. It also shows that he received more than $237,000 in fees for his services to Cundall. Based on his 50 percent contingency contract and his prayer for relief, which sought compensatory and punitive damages totaling $300 million, he and the Cundall beneficiaries stood to gain much more if the litigation was successful. Thus, we find that Ward knowingly used Koons's confidences or secrets for his own advantage in violation

of DR 4-101(B)(3). *See Disciplinary Counsel v. Yurich*, 78 Ohio St.3d 315, 677 N.E.2d 1190 (1997) (finding that a lawyer's targeted mail solicitation touting benefits of living trusts and disclosing that the recipient had been named as a successor trustee of a trust the lawyer had prepared for the recipient's grandparents violated DR 4-101(B)(3)).

*Exercise of Independent Professional Judgment*

{¶ 35} Relator has also charged Ward with violations of two Disciplinary Rules that regulated a lawyer's acceptance of employment in situations that may affect the lawyer's ability to exercise his or her independent professional judgment.

The first of those rules, DR 5-101(A)(1), prohibits a lawyer from accepting employment if the lawyer's exercise of professional judgment on behalf of the client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests, *unless* the client consents after full disclosure.

{¶ 36} The board recognized that Ward's conduct was motivated partly by a sincere desire to recover compensation that he believed the Cundall beneficiaries were entitled to receive as well as by the prospect of a sizeable contingency fee, but found that neither of those interests would impair his ability to exercise his independent professional judgment on behalf of Cundall.

{¶ 37} But the board also determined that a significant motivation for Ward's conduct was a desire to "gain satisfaction" or settle the score for what he perceived as his father's forced exit from Bud Koons's business affairs. The evidence demonstrates not only that Ward was angry when his father was asked to extricate himself from Koons's business affairs, but that within a few weeks of Koons's death, Ward had accessed confidential information related to Trust B and began to question the propriety of Koons's actions as trustee. The board found that a reasonable person with no personal interest in the outcome would have been

14

very reluctant to pursue Cundall's claims without clear evidence of Koons's motivation for redeeming the CIC shares in 1984. The board concluded, however, that Ward's personal interest in righting the perceived wrong against his father led him to disregard the evident conflict of interest and to use Bud Koons's confidences accumulated by his father and Graf against the firm's former client's interests.

{¶ 38} Thus, the board found not only that Ward's personal interest in righting this wrong affected his ability to exercise his professional judgment on behalf of Cundall in violation of DR 5-101(A)(1), but also that the violation was so egregious as to warrant a finding that his conduct adversely reflects on his fitness to practice law in violation of DR 1-102(A)(6) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law). *See Disciplinary Counsel v. Bricker*, 137 Ohio St.3d 35, 2013-Ohio-3998, 997 N.E.2d 500, ¶ 21 (holding that in order to find a violation of Prof.Cond.R. 8.4(h), which replaced DR 1-102(A)(6), there must be clear and convincing evidence that a lawyer has engaged in conduct that, while not specifically prohibited by the rules, nonetheless adversely reflects on the lawyer's fitness to practice law, *or* that the lawyer's conduct is sufficiently egregious to warrant an additional finding that it adversely reflects on the lawyer's fitness to practice law).

{¶ 39} The board recommends, however, that we dismiss the alleged violation of DR 5-105(A) (requiring a lawyer to decline proffered employment if acceptance of the employment will or is likely to adversely affect the exercise of the lawyer's independent professional judgment on behalf of another client). This recommendation was based on the following facts: (1) Ward did not accept employment related to Cundall's interest in the trust until April 2005, (2) any attorney-client relationship between Bud Koons, Dick Ward, and Drew & Ward that was substantially related to the administration of the grandparent trust terminated in February 2005, and (3) any work Ward, Dick Ward, or the firm

performed for Bud Koons, his estate, or his companies after February 2005 was limited to transmitting information in Dick Ward's possession that was necessary for the administration of Koons's estate. Thus, none of the Koons entities was an active client and there was no current representation that would have required Ward, or any other attorney at Drew & Ward, to exercise his independent professional judgment on behalf of Koons.

{¶ 40} Therefore, we find that Ward's conduct violates DR 5-101(A)(1) and 1-102(A)(6) and dismiss the alleged violation of DR 5-105(A).

*Count I's Allegations of Dishonesty and*

*Conduct Prejudicial to the Administration of Justice Dismissed*

{¶ 41} In his complaint, relator alleges that Ward misled his partners at Drew & Ward about the conflict of interest inherent in his representation of Cundall against the estate of his father's longtime client and the trustees of multiple trusts his father created for that client in violation of DR 1-102(A)(4) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation). Although the board disagreed with Ward's analysis of the conflict issue and the conclusions that he communicated to his partners, it found that Ward had provided his partners with "significant truthful statements" concerning the facts he had gleaned from his research and "a significant volume of decisional authority" that was relevant to the issue at hand. And because those partners were all experienced attorneys who had the ability to review the information provided by Ward and either draw their own conclusions or request additional information, the board found that relator had failed to prove by clear and convincing evidence that Ward's conduct violated DR 1-102(A)(4).

{¶ 42} The board likewise declined to find that Ward's conduct, which triggered significant litigation (including a malpractice action against him), violated DR 1-102(A)(5) (prohibiting a lawyer from engaging in conduct that is prejudicial to the administration of justice). While the board determined that

16

Ward was not an appropriate attorney to file the action on behalf of Cundall, it was unwilling to conclude that Cundall's claims should never have been pursued by any attorney. In support of this conclusion, the board noted that (1) no court had found that the filing of the action was frivolous, (2) the First District Court of Appeals held that the defendants bore the burden of proving that Bud Koons's actions regarding the purchase of the CIC shares owned by Share B of the trust were undertaken in the utmost good faith and most scrupulous honesty, *Cundall v. U.S. Bank*, 174 Ohio App.3d 421, 2007-Ohio-7067, 882 N.E.2d 481, ¶ 38, and (3) this court disposed of the case on statute-of-limitations grounds and therefore did not reach the merits of Cundall's claims. *Cundall v. U.S. Bank*, 122 Ohio St.3d 188, 2009-Ohio-2523, 909 N.E.2d 1244, ¶ 41.

{¶ 43} We adopt the board's findings and hereby dismiss the alleged violations of DR 1-102(A)(4) and 1-102(A)(5).

### Count II—Commingling of Cundall Real Estate Proceeds

{¶ 44} In 2003, Michael Cundall's wife, Ann, sold a house. Ward testified that he attended the July 30, 2003 real estate closing with the couple and accepted the net proceeds—$113,076.79—as a qualified intermediary for a tax-deferred 1031 exchange. He expressly denied that he served as the Cundalls' attorney in this transaction. Ward testified that he deposited the net sale proceeds into his client trust account the next day in accordance with Ann's verbal instructions to invest the money until she found another parcel of real estate to purchase.

{¶ 45} Ward transferred $10,000 of the proceeds to a bank account held by her husband on August 1, 2003, purportedly at Ann's request. He then transferred most of the remaining balance as a "loan" to himself and invested the money in his personal securities account. After Michael Cundall called and requested the balance of the proceeds, Ward paid the balance plus 5 percent interest to the Cundalls in three installments on August 21, August 25, and

September 3, 2013. The initial payment of $13,000 came from Ward's client trust account, but the other payments came from accounts belonging to him.

{¶ 46} At her deposition, Ann testified that her husband had invited Ward, who she reported had been handling some legal matters for them, to join them at the real estate closing in case there were any problems. She did not know what a 1031 exchange was and stated that she had no intention of purchasing another home because she and her husband already owned two homes—although a 1031 exchange would require her to purchase and take possession of a like-kind property within 180 days of the transfer of the relinquished property. *See* 26 CFR 1031(k)-1(b)(2)(ii). Ann also denied having given Ward any instruction to invest the proceeds of the sale. In fact, she believed that the funds had been deposited into her personal account following the closing. Michael Cundall's deposition testimony was consistent with that of his wife.

{¶ 47} The board found that Ward's testimony regarding his role in the real estate transaction was not credible. Not only did Ann and Michael Cundall's testimony directly contradict Ward's, but Ward acknowledged that a written exchange agreement was necessary for him to serve as a qualified intermediary for a tax-deferred 1031 exchange, and he admitted that he did not obtain such an agreement from Ann. *See* 26 C.F.R. 1.1031(k)-1(g)(4)(iii)(B). He was also aware that a seller's attorney is not eligible to serve as a qualified intermediary and claimed that he had never served as Ann's attorney in the past. *See* 26 C.F.R. 1.1031(k)-1(k)(2) (disqualifying a person who as acted as the taxpayer's attorney within the two-year period ending on the date of the transfer of the first relinquished property from serving as a qualified intermediary). But the board found Ann's testimony to be more credible.

{¶ 48} With respect to the Ann Cundall real estate transaction, the board found that Ward's conduct violated DR 1-102(A)(4) and 9-102(A) (requiring a lawyer to hold property of clients separate from the lawyer's own property) and

that his misleading statements were so egregious as to warrant an additional finding that he violated DR 1-102(A)(6). However, the board found that relator failed to prove that Ward had planned to personally profit from his receipt of the sale proceeds when he agreed to attend the real estate closing on Ann Cundall's behalf and declined to find that his conduct violated DR 5-101(A)(1).

{¶ 49} We adopt these findings of fact and misconduct and dismiss the alleged violation of DR 5-101(A)(1).

**Sanction**

{¶ 50} When imposing sanctions for attorney misconduct, we consider relevant factors, including the ethical duties that the lawyer violated and the sanctions imposed in similar cases. *Stark Cty. Bar Assn. v. Buttacavoli*, 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16. In making a final determination, we also weigh evidence of the aggravating and mitigating factors listed in BCGD Proc.Reg. 10(B).[2] *Disciplinary Counsel v. Broeren,* 115 Ohio St.3d 473, 2007-Ohio-5251, 875 N.E.2d 935, ¶ 21.

{¶ 51} As aggravating factors, the board found that Ward acted with a selfish motive when he decided to represent Michael Cundall in an action against Bud Koons and when he deposited Ann Cundall's real estate proceeds in his personal investment account, that he refused to acknowledge the wrongful nature of his conduct, and that he committed multiple offenses. *See* BCGD Proc.Reg. 10(B)(1)(b), (d), and (g). The board also found that Ward's testimony concerning his involvement in the Ann Cundall real estate transaction was not credible.

{¶ 52} As mitigating factors, the board found that Ward does not have a prior disciplinary record, has made a timely, good-faith effort to make restitution and to rectify the consequences of his misconduct, has complied with the terms of the malpractice settlement and with his agreement to indemnify the Drew & Ward

---

[2] Effective January 1, 2015, the aggravating and mitigating factors previously set forth in BCGD Proc.Reg. 10(B)(1) and (2) are codified in Gov.Bar R. V(13), 140 Ohio St.3d CXXIV.

law firm, and has submitted six letters from attorneys, clients, and friends attesting to his good character and reputation apart from the charged misconduct. *See* BCGD Proc.Reg. 10(B)(2)(a), (c), and (e).

{¶ 53} Relator argued that a two-year suspension is the appropriate sanction for Ward's ethical lapses. Ward, in contrast, argued that relator's complaint should be dismissed. The board, however, recommends that we impose a one-year actual suspension. In support of that sanction, the board notes that conduct involving dishonesty typically results in an actual suspension from the practice of law. *See, e.g., Disciplinary Counsel v. Pfundstein*, 128 Ohio St.3d 61, 2010-Ohio-6150, 941 N.E.2d 1180, ¶ 25, quoting *Disciplinary Counsel v. Rooney*, 110 Ohio St.3d 349, 2006-Ohio-4576, 853 N.E.2d 663, ¶ 12 (" '[d]ishonest conduct on the part of an attorney generally warrants an actual suspension from the practice of law' "). The board cites eight cases involving ethical violations that are comparable to those at issue here and imposing sanctions ranging from a one-year fully stayed suspension to permanent disbarment. *E.g., Disciplinary Counsel v. Kimmins*, 123 Ohio St.3d 207, 2009-Ohio-4943, 915 N.E.2d 330 (imposing a one-year suspension, all stayed on conditions, for an attorney who misused a client's confidential information to gain consent of the client's children to an action that he knew was contrary to the client's wishes, converted some of his client's personal property, and failed to properly account for the client's property); *Disciplinary Counsel v. Terbeek*, 135 Ohio St.3d 458, 2013-Ohio-1912, 989 N.E.2d 55 (disbarring an attorney for misappropriating funds that he was obligated to hold in escrow for a third party and for failing to cooperate in the disciplinary process). No one has objected to the board's recommendation.

{¶ 54} Of the cases cited by the board, we find that *Disciplinary Counsel v. Cicero*, 134 Ohio St.3d 311, 2012-Ohio-5457, 982 N.E.2d 650, is most instructive. Cicero twice met with a man after federal law-enforcement officials raided the man's home and seized $15,000 to $20,000 worth of Ohio State

20

University ("OSU") football memorabilia as part of a drug-trafficking investigation. Thereafter, Cicero revealed specifics of the man's case to the OSU football coach. Because the evidence established that (1) Cicero and the man had discussed the possibility of a lawyer-client relationship, (2) the man had disclosed confidential information that was not generally known, and (3) Cicero had given the man advice of a legal nature during one of their conversations, we found that he was a prospective client who had a reasonable expectation of confidentiality. Therefore, we found that Cicero's "almost immediate dissemination of the detailed information" that the man provided violated Prof.Cond.R. 1.18 (prohibiting a lawyer from using or revealing information learned in consultation with a prospective client except as the lawyer would be permitted to disclose the information with respect to a former client pursuant to Prof.Cond.R. 1.9) as well as Prof.Cond.R. 8.4(h) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law). *Id.* at ¶ 13, 15.

{¶ 55} The only mitigating factor in *Cicero* was his excellent reputation among judges and attorneys for his professional integrity and competence. *Id.* at ¶ 17. In contrast, we found that five aggravating factors were present, including (1) Cicero's prior disciplinary offense, which resulted in a one-year suspension from the practice of law, *see Disciplinary Counsel v. Cicero*, 78 Ohio St.3d 351, 678 N.E.2d 517 (1997), (2) his selfish motive in disclosing his prospective client's confidential information for the purpose of self-aggrandizement, (3) his disingenuous testimony that was not credible, (4) his refusal to acknowledge the wrongful nature of his misconduct, and (5) the harm caused to the prospective client in the form of criticism and harassment by the news media and others for causing harm to the OSU football program. *Id.* at ¶ 17; *see also* BCGD Proc.Reg. 10(B)(1)(a), (b), (f), (g), and (h).

{¶ 56} Here, Ward used Koons's confidences and secrets not only to the disadvantage of Koons's estate and business and trust interests, but also used

them to his own advantage. His attempts to explain away the obvious conflict of interest in accepting the Cundall representation are simply not credible. We do not accept his claims that Koons was not *his* client and that he performed no work on behalf of Koons, in part because he almost simultaneously admitted that he had performed some work in Koons's divorces and the Pepsi litigation and that he had reviewed confidential Koons information held by Drew & Ward following Bud's death for the purpose of determining how Trust B would be distributed. His efforts to attribute the information he and his firm received regarding Koons's various personal and business interests to separate roles outside of the confidential attorney-client relationship are similarly unavailing.

{¶ 57} In addition to engaging in misconduct involving the confidences and secrets of a client that is comparable to Cicero's misconduct, Ward also engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation, when, instead of holding Ann Cundall's property in his client trust account, he withdrew approximately $90,000 of her money and placed it in his own personal investment account. Although he responded to the client's request for return of the money approximately one month later and returned it with interest, he was unable to return the funds immediately or in a single lump sum. Moreover, the board found that his testimony regarding this transaction was not credible, and his conduct with respect to both counts was so egregious as to reflect adversely on his fitness to practice law. But, unlike Cicero, Ward does not have any prior disciplinary record in his more than 30 years of practice. Ward has also settled the Koons malpractice action, complied with the terms of that settlement agreement, made timely restitution to Ann Cundall, and presented some evidence of his good character and reputation for integrity apart from this misconduct.

{¶ 58} Having considered Ward's misconduct, the aggravating and mitigating factors present in this case, and sanctions we have imposed for comparable misconduct, we believe that the board's recommended sanction will

adequately protect the public from future misconduct. Accordingly, Richard Grove Ward is suspended from the practice of law in Ohio for one year. Costs are taxed to Ward.

Judgment accordingly.

O'CONNOR, C.J., and PFEIFER, O'DONNELL, LANZINGER, KENNEDY, FRENCH, and O'NEILL, JJ., concur.

_____

Scott J. Drexel, Disciplinary Counsel, and Karen H. Osmond, Assistant Disciplinary Counsel, for relator.

Amelia A. Bower, for respondent.

_____